CLINTON, ET AL., RESPONDENTS, v. MILLER, ET AL., APPELLANTS.

No. 9026.
Submitted December 7, 1950. Decided January 13, 1951.
Amended January 16, 1951.
226 Pac. (2d) 487.

464

466

Mr. Paul T. Keller, Helena, for appellant.

Mr. Victor H. Fall, Mr. William A. Brown, Helena, for respondent.

Mr. C. E. Pew, Helena, amicus curiae.

Mr. Keller, Mr. Fall and Mr. Pew argued orally.

MR. CHIEF JUSTICE ADAIR:

On April 14, 1950, J. Henry Clinton and wife entered into a written contract with Ferd Miller and wife wherein the Clintons agreed to sell and the Millers agreed to purchase lot numbered 15 in block numbered 15 of the Lockey Addition to the city of Helena, Montana, for an agreed consideration, one-third whereof was paid upon the signing of the contract with the balance to be paid by the Millers upon the delivery to them of a warranty deed conveying a merchantable title, free and clear of all encumbrances and liens.

The Clintons delivered to the Millers a duly certified abstract of title to the lot prepared by a qualified licensed abstracter which abstract the Millers then submitted to their attorney for examination and opinion. After examining the abstract the attorney declined to approve the title and wrote his clients as follows:

"Mr. and Mrs. Ferd Miller

Route 1

Helena, Montana

"Dear Mr. and Mrs. Miller:

"I have examined the Helena Abstract and Title Company's abstract No. 2612 covering Lot 15 in Block 15 of the Lockey Addition to the City of Helena. The matters in this opinion are

based entirely upon the information contained in that abstract.

"The title to said premises is in J. H. Clinton subject to the following defects:

"In 1873, a bond for deed was given to Jacob D. Tietzen and A. N. Rand and that interest assigned to Thomas Perry and Peter Larkin. Peter Larkin, thereupon deeded to Richard Hoback and Henry Pflaume. Richard Hoback and Henry Pflaume never disposed of their interest. The other interest passed to Charles W. Cannon and Robert C. Wallace. The name Wm. Carr appears in the abstract in that transaction and William Carr deeded so that some interest in said premises still remains in Thomas Perry, Wm. Carr, Richard Hoback, Henry Pflaume, Charles W. Cannon and Robert C. Wallace.

"Sam'l Schwab received the deed to that property in 1882 and deeded the same as Samuel Schwab. There is no presumption that an abbreviation of a man's name is one and the same person whose name is written out.

"By deed dated April 25, 1876, and recorded January 29, 1880, Peter Larkin conveyed his interest to other parties as appears on page 11 of the abstract. He was not joined in this conveyance by his wife, nor is there any affidavit that I can find in the abstract indicating that he was a single man at that time. It follows that there is an outstanding dower interest in the wife of Peter Larkin in the absence of proof that he was not married.

"The county took title to the within property by Tax Deed dated October 31, 1929, and by deed dated April 11, 1936, conveyed the same to R. C. Hoffman, who in turn, with his wife, by deed recorded February 6, 1946, conveyed the same to J. H. Clinton, of Helena, Montana, the present owner. J. H. Clinton thereafter filed an action to quiet title to said property in himself. There are several procedural errors in the quiet title proceedings which may be briefly enumerated as follows:

"1. The concluding phrase of the named defendants which is inserted for the obvious purpose of coming within the provisions of Section 93-6204, R. C. M. 1947, fails to show a comma after

the word estate. The statute provides for the 'adding in the caption of the complaint in such action the words' and it would seem that the foregoing makes absolute compliance with the wording in the statute mandatory.

"2. On page 77 of the abstract and following there appears the affidavit for the Order for Publication of Summons. Section 93-6207, R. C. M. 1947, provides that the 'Plaintiff' may obtain such an order by filing with the Clerk of the Court an affidavit stating that 'he' has made diligent search and etc. There is nothing in the section of the statute quoted which authorized the attorney for the plaintiff or any other person to make an affidavit on his behalf. It would follow that the person authorized by the statute has not been the proper party to make the affidavit.

"3. On page 72 of the abstract there is the bare statement that the Lis Pendens was filed October 9, 1946. Section 93-6205, R. C. M. 1947, would seem to require proof in the record of the Clerk of the Court of the filing of the Lis Pendens with the Clerk and Recorder. I do not believe that the record shows any such proof having been made.

"4. Section 93-6206, R. C. M. 1947, provides, among other things, that an affidavit must be filed for Publication of Summons 'upon the return of the summons showing due personal service within the state' and etc. The original Summons in this action, according to page 84 of the abstract, was filed with the Clerk December 9, 1946. The affidavit for Publication of Summons was filed October 25, 1946, and the Order was issued the same day, as appears on pages 77 and 79 of the abstract. It follows that the original summons was not filed with the Clerk of the Court until subsequent to the time when the Order of Publication was made and by reason thereof the entire proceedings regarding publication were in violation of the statute and valueless.

"5. Section 93-3020, R. C. M. 1947, provides that the sheriff or other person serving the Summons shall make due and legal

return of such service and file the same with the Clerk of the Court not more than ten days after the making of such service. The returns of the several sheriffs who served the Summons shows that the last service made was by the sheriff of Cascade County and that he served a copy of the Summons and Complaint on the first and second days of November, 1946. The Summons not having been filed until December 9, 1946, more than ten days had elapsed which is a fatal defect to the proceedings.

"By reason of the foregoing several defects in the title it is my opinion that J. H. Clinton does not, at this time, have merchantable title to the foregoing property.

"Respectfully submitted,"<br>[and signed]

Upon receipt of the above opinion the Millers refused to perform their contract and thereupon, on June 6, 1950, J. H. Clinton and wife as plaintiffs commenced this action against Ferd Miller and wife as defendants for a declaratory judgment determining the rights and duties of the plaintiffs and defendants under their contract.

Appearing in the action by their said attorney the defendants Miller urged the same objections to Clinton's title as are set forth in their attorney's opinion. The cause was tried to the court sitting without a jury, witnesses were examined and documentary evidence received, including the abstract of title, following which the court made written findings of fact and conclusions of law wherein it found and held each of the listed objections to the title to be without merit and in conformity thereto on July 20, 1950, rendered its decree adjudging: That none of the objections made by defendants to Clinton's title is valid; that none casts any cloud upon such title; that the plaintiffs are the owners in fee simple and entitled to the possession of the property; that such title is merchantable and that upon the delivery to them of proper deed of conveyance the defendants shall forthwith perform their obligations under the contract.

From the decree so entered the defendants Miller have ap-

pealed, assigning 13 specifications of error, 11 whereof challenge the trial court's findings while the remaining two challenge its conclusions.

*Title to Lot 15.* From September 22, 1913, to January 21, 1926, the duly recorded fee simple title to lot 15 was in State Investment Company, a Montana corporation, to which corporation the lot was assessed. The corporation failed to pay the state and county taxes levied against the property for various years including those for the year 1925 and on January 21, 1926, after due notice given, the lot was sold to Lewis and Clark county for delinquent taxes. There was no redemption from the tax sale and no assignment of the tax sale certificate and on October 31, 1929, by duly recorded tax deed the county treasurer granted the lot to the county. The record title thereafter continuously remained in the county until April 11, 1936, on which date, by duly recorded bargain and sale deed it conveyed the lot to R. C. Hoffman and thereafter Hoffman and wife by deed acknowledged December 5, 1945, conveyed, remised, released and quit claimed the lot unto J. H. Clinton, who, according to the testimony, thereupon entered into possession of and improved the property and has since continued as its owner and paid the taxes thereon.

*Quiet Title Action.* On October 9, 1946, J. H. Clinton, as plaintiff commenced an action in the district court of Lewis and Clark county to quiet his title to lot 15 and other described real property. The complaint shows that the action is against 66 specifically named defendants, including the county of Lewis and Clark, the city of Helena, State Investment Company, an expired Montana corporation, Richard Lockey, Jr., the sole surviving trustee for the stock holders and creditors of said State Investment Company, and that it is also against all persons unknown who might make any adverse claim, the concluding phrase of the caption of the complaint reading: "the unknown heirs and devisees of the defendants, if any there be, and all other persons, unknown, claiming or who might claim any right, title, estate or interest in, or lien or encumbrance upon, the real

property described in the complaint, or any thereof, adverse to plaintiff's ownership, or any cloud upon plaintiff's title thereto, whether such claim or possible claim be present or contingent, including any claim or possible claim of dower, inchoate or accrued, Defendants.'' It will be noted that there is no comma after the word ''estate'' in the above quoted phrase nor should there be.

On the day of the filing of the complaint, summons issued and proper written notice of the pendency of the action was filed in the office of the county clerk and recorder. The original summons, the summons published and the *lis pendens,* each and all bear the identical title and caption stated in the complaint.

*''Procedural Errors.''* Defendants' counsel objects to Clinton's quiet title proceedings because of what he terms ''procedural errors'' enumerated as follows: (1) Failure to show a comma after the word ''estate'' in the above quoted concluding phrase of the caption to the complaint and summons; (2) the making and filing by plaintiff's attorney of the affidavit for the order for publication of summons; (3) failure to file with the clerk of court documentary proof of the filing of *lis pendens* in the office of the county clerk and recorder; (4) failure to file the original summons with the clerk of court prior to filing the affidavit for publication of summons, and (5) failure to file the original summons with the clerk of court within either 10 or 15 days after the making of service.

None of the foregoing constitutes a ''procedural'' error and none invalidates Clinton's quiet title proceedings, his decree nor his title to the property involved.

*The Missing Comma.* It is well nigh impossible to imagine a more frivolous hairsplitting objection or contention than that the absence of a comma in the caption of a complaint or summons in a quiet title action constitutes a ''procedural error'' affecting the jurisdiction of the court, rendering the proceedings defective and either adversely affecting or invalidating plaintiff's decreed title to real property.

472

In the above quoted concluding phrase of the caption are 15 commas. None is either necessary, material or of any moment. Each and all well could have been omitted without doing any violence whatever to either the statute, the proceedings or the title.

No magic attends upon copying from the statute the exact phrase word for word and mark for mark. The phrase is not exclusive nor is its use mandatory. Precisely the same results may be achieved by employing other and fewer apt words.

A comma is a point used to mark the smallest structural divisions of a sentence, or a rhetorical punctuation mark indicating the slightest possible separation in ideas or construction. Black's Law Dictionary, Deluxe 3rd Ed., p. 356.

Punctuation is no part of the English language. It is always ■ subordinate to the text. Never must punctuation marks of themselves be permitted to control the meaning of the text of a legislative enactment. The words of the act control the punctuation marks and not the punctuation marks the words.

"The presence or absence of a comma, according to the whim of the printer or proof reader, is so nearly fortuitous that it is a wholly unsafe aid to statutory interpretation." Erie R. Co. v. United States, 6 Cir., 240 F. 28, 32. Compare: McPhail v. Gerry, 55 Vt. 174; United States v. York, C. C., 131 F. 323; Traveler's Ins. Co. v. Pomerantz, 124 Misc. 250, 207 N. Y. S. 81, 86; United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 82, 53 S. Ct. 42, 77 L. Ed. 175; In re Schilling, 2 Cir., 53 F. 81; Hammock v. Farmers' Loan & Trust Co., 105 U. S. 77, 22 L. Ed. 1111; Cushing v. Worrick, 9 Gray 382, 75 Mass. 382; Albright v. Payne, 43 Ohio St. 8, 1 N. E. 16.

The statute in question was originally enacted in 1915 by the Fourteenth State Legislative Assembly. There was and is no comma after the word "estate" in this Act as passed by that assembly. See page 2 line 17 of original enrolled House Bill No. 342 on file in the office of the secretary of state. Read section 2 of Chapter 113 of the official published Session Laws of 1915 at page 251.

Who sought to improve upon the grammar and punctuation ██ of the 1915 legislature by inserting a comma after the word "estate" and whence came such individual's authority to make such "amendment" we shall not here stop to inquire. Suffice it to say however, that the added comma not only makes for bad grammar but apparently tends to so befuddle hypertechnical title examiners as to render them uncertain if not wholly incapable of determining whether its absence from a busy lawyer's pleadings and papers may not deprive the court of jurisdiction and "jeopardize" various and sundry land titles throughout the state of Montana. The title examiner's assignment is not to examine the abstract and records for mistakes in orthography, punctuation and grammar but to determine therefrom the condition of the title involved. The law disregards trifles, R. C. M. 1947, sec. 49-125, and so must title examiners and the courts. There is no merit in defendants' two specifications grounded upon the "missing" comma.

*Affidavit by Attorney.* Section 2, subd. 6870d of Chapter 113, Session Laws of 1915 at page 252 provides that in a suit to quiet title the plaintiff may obtain an order for the service of summons upon all unknown claimants or possible claimants by publication, "upon *filing* with the clerk of the court *an* affidavit showing that he has made diligent search and inquiry for all persons who claim, or might claim, any right, title, estate, or interest in, or lien, or encumbrance upon" the described real property and that he "has specifically named as defendants in such action all such persons whose names can be ascertained." Compare R. C. M. 1947, sec. 93-6207.

In the quiet title suit the above mentioned affidavit was made ██ and filed by plaintiff's attorney of record in the action. Counsel for the defendants Miller assert that there is nothing in the above statute that authorizes the plaintiff's attorney to make the affidavit on behalf of his client. No express authority is required. The attorney's retainer carries with it the presumptive authority to file any and all necessary pleadings and papers

in the action including, in the absence of a statute prohibiting, the authority to make affidavits on behalf of his client as to facts and matters of which the attorney has peculiar and personal knowledge.

A party to an action or proceeding in court may appear therein in his own proper person or he may appear by an attorney at law but he cannot do both. A party having an attorney of record in an action or other proceeding in court must be heard in court through such attorney and as a general rule the court has no power or authority of law to recognize anyone in the conduct or disposition of the case except the attorneys of record therein. Endresse v. Van Vleet, 118 Mont. 533, 536, 169 Pac. (2d) 719.

The relation of attorney and client is a relation of agency. The maxim, *"qui facit per alium, facit per se,"* i. e. "He who does an act through another is deemed in law to do it himself" applies and enunciates the general doctrine on which the law relative to the rights and liabilities of principal and agent depends. The one for whom the action is taken is the principal and the one who is to act is the agent. Restatement of the Law of Agency, sec. 1, p. 7.

In 2 Mechem on Agency, 2nd Ed. at pages 1736-1738, the author, speaking of the implied authority of attorneys at law, says:

"Section 2160. Has general control of conduct of suit.—A party employs an attorney to conduct and manage his cause in court because he himself lacks the learning, experience and ability necessary to its successful prosecution, and because he believes that the attorney possesses these qualifications. The object sought is the prosecution or defense of the cause, and the authority to accomplish this is confided to the attorney. As in other cases, this authority must carry with it all the incidental and auxiliary powers which are reasonable and proper to carry the main power into effect. Much of the procedure in the case is governed by rules of court with which the attorney is familiar, and which it is his duty to observe. The orderly conduct of the

cause requires that the settled course of practice shall be adhered to, with which the attorney, and not the client, is presumed to be acquainted.

"When, therefore, a party puts his cause into the hands of an attorney, the latter is necessarily vested with large, if not exclusive authority, to control the conduct and management of the suit in all matters which pertain to the remedy, and which do not involve the substantial rights of the client. For the due and orderly conduct of the cause, the court holds the attorney responsible, and these matters the client, while he has an attorney of record, has no right to interfere with or to control.

"Section 2161. Presumption of authority.—So whatever the attorney does in the prosecution of the remedy, if it be not done fraudulently or collusively, is said to be binding upon the client, although it may result disastrously to him, and he must find his remedy in an action against the attorney. And this rule is not confined to the proceedings had in court, but includes all acts, whether done in or out of court, necessary or incidental to the prosecution or defense of the suit, and which affect the remedy only and not the cause of action. * * *

"Section 2162. What included.—It is obviously impracticable to detail all of the acts which the attorney at law, by reason of his employment, has implied authority to do respecting the conduct of the cause, but as incidental to his authority to manage and control the general course and conduct of the cause, the attorney of record has been held to have implied power:—

"a. To make such affidavits as are required in the progress of the cause, when the facts are within his knowledge. * * *"

1 Thornton on Attorneys at Law, sec. 251, pp. 460, 461, sets forth the general rule, namely: "In the absence of statutory regulation to the contrary, an attorney may make an affidavit for his client, providing he has sufficient knowledge of the facts; in such case, however, the affidavit should show the reason for the party's failure to make it personally, though in some states

476

no such showing is required, the attorney's authority being presumed, or provable by extrinsic evidence.''

In accord with the foregoing rules our Code of Civil Procedure providing for the making of affidavits of verification by a party litigant provides such affidavits may also be made by the agent or attorney of the party, if the party is absent from the county where the attorney resides, ''or is from any other cause unable to'' make the affidavit in which case it must state that the deponent is the agent or attorney of the party and the reasons why such affidavit is made by such agent or attorney. R. C. M. 1947, sec. 93-3702.

Section 93-6207 does not say that the *plaintiff must personally* make the affidavit nor does it say that the plaintiff *must personally file* it.

There is nothing in sections 93-3013, 93-6206 or 93-6207, R. C. M. 1947, that precludes plaintiff's attorney from either *making* or *filing* the affidavit. In his affidavit plaintiff's attorney deposes that he is an attorney for the plaintiff and as such more familiar with the matters, facts and things therein stated than is plaintiff for which reason he makes the affidavit for the plaintiff and then follows a rather complete and comprehensive statement of specific acts and things personally done by the affiant in making the required search and inquiry.

It has long been the custom and general practice in this jurisdiction for the plaintiff's attorney to personally make the required search and inquiry or to see that same is properly done and thereafter to make and file the required affidavit and we find no statutory prohibition against such practice. Compare: State ex rel. Allen v. Napton, 24 Mont. 450, 454, 62 Pac. 686 construing section 731 and section 1942, Code of Civil Procedure of 1895, now R. C. M. 1947, sections 93-3702 and 93-9003; State ex rel. Kolbow v. District Court, 38 Mont. 415, 100 Pac. 207; Shattuck v. Myers, 13 Ind. 46, 74 Am. Dec. 236; Weigel v. Hohn, 45 Ariz. 81, 39 Pac. (2d) 933; Collins v. Streitz, 47 Ariz. 146, 54 Pac. (2d) 264; Evans v. Hallas, 64 Ariz. 142, 167 Pac. (2d) 94.

*Lis Pendens.* Defendants contend that the records fail to show proof to the clerk of the court of the filing in the office of the county clerk and recorder of *lis pendens* in the quiet title action.

The records in the office of the county clerk and recorder show that at 10:45 o'clock a. m. on the day the suit to quiet title was commenced, proper *lis pendens* in the action was filed in such office where it was given Document Number 18487. The abstracter found such record and devoted three pages of his abstract to showing the contents of the *lis pendens* so filed.

Additionally the records and papers in the quiet title suit on file in the office of the clerk of the district court show that in such suit the district court expressly found that "it further appearing to the court by *due proof* that notice of pendency of this action was filed in the office of the county clerk and recorder on the 9th day of October 1946, being the date of the filing of the complaint" etc.

Defendants cite R. C. M. 1947, section 93-6205, but this section specifies no particular or exclusive kind of proof to establish the fact that *lis pendens* was filed in the county clerk's office. It merely provides that before "any order for the publication of summons is granted as hereinafter provided" the plaintiff shall file proper notice of the pendency of the action in the office of the county clerk and recorder, the order referred to being that provided for in R. C. M. 1947, section 93-6207.

Defendants may not close their eyes to the facts appearing in the records of Lewis and Clark county showing timely filing in the designated office of proper *lis pendens* and their contention, which ignores these publicly recorded facts, cannot be sustained.

*Filing Summons.* Defendants assign as error the district court's holding that the statutes do not require that the original summons be physically filed with the clerk of court prior to the filing of the affidavit for an order for the publication of summons.

R. C. M. 1947, section 93-6202, provides that the provisions of sections 93-3001 to 93-3020, inclusive, are applicable to actions

to quiet title and thus is R. C. M. 1947, section 93-3013 relating to the publication of summons made applicable to such actions.

We find no provision in either section 93-3013, 93-6206 or 93-6207 that says that the original summons with the return thereon must *first* be filed with the clerk of the court before an order for publication may be obtained. Section 93-6207 provides the plaintiff may obtain the order "upon filing with the clerk of the court *an* affidavit" showing the facts called for and sufficient compliance is effected when as here plaintiff's attorney makes and files "*an* affidavit" stating such essential facts.

*Return of Summons.* There were 66 specifically named defendants in the quiet title action and plaintiff's attorney was charged with the responsibility of making due search and inquiry as to the whereabouts of such defendants to the end that jurisdiction be obtained over the person of each.

The summons is the process by which the defendant is summoned into court. The purpose of serving a summons is to give notice to the defendant and thereby afford him the opportunity to defend himself or his property—an essential to due process of law. Haggerty v. Sherburne Mercantile Co., 120 Mont. 386, 186 Pac. (2d) 884.

Process is employed only to obtain jurisdiction over the person of the defendant. State ex rel. Murphy v. Second Judicial District Court, 99 Mont. 209, 41 Pac. (2d) 1113. That jurisdiction is acquired at the instant the summons is served and before any proof of such service has been made. Compare State ex rel. Duckworth v. District Court, 107 Mont. 97, 80 Pac. (2d) 367.

After the summons is served and jurisdiction over the person of defendant is thus obtained orderly procedure dictates that evidence be supplied of the fact that service has been made. Where summons is personally served upon a defendant by a sheriff the latter is required to make a statement in writing of what has been done by him in making such service which statement is usually either endorsed on the summons or attached

thereto. This written statement constitutes the officer's "return." Haggerty v. Sherburne Mercantile Co., supra; Schmidt v. Schmidt, 108 Mont. 246, 89 Pac. (2d) 1020. Such "return" is merely the evidence by which the court, the litigants, their attorneys or others interested are informed that the defendant has been served. Compare Smith v. Hamill, 111 Mont. 585, 112 Pac. (2d) 195. However it is not the "return" or other evidence or proof of service which gives the court jurisdiction over the person of the defendant but it is *the fact of service* that confers such jurisdiction. Haggerty v. Sherburne Mercantile Co., supra; State ex rel. Duckworth v. District Court, supra.

R. C. M. 1947, section 93-3020 makes it the duty of the sheriff or other person serving a summons "to make due and legal return of such service, and file the same with the clerk of the court * * * not more than ten days after the making of such service, where the same was made in the county in which such action * * * is pending, and not more than fifteen days after the making of such service, when the same was made outside of the county in which such action * * * is pending." The statute further provides: "Any failure to make and file such return as required may be punished as a contempt of court." Such is the penalty that attaches for failure to comply with the provisions of section 93-3020, supra, and not loss of jurisdiction over the defendant served.

The original summons in Clinton's quiet title action has attached thereto the separate return of the sheriff of each of three counties in the state. The return of the sheriff of Lewis and Clark county dated October 10, 1946, shows that he received the summons on October 9, 1946, being the day it was issued and that he personally served it on numerous specifically named defendants. The return of the sheriff of Flathead county shows that he received the summons on October 19, 1946, and after making due and diligent search and inquiry for two of the named defendants was unable to find them in his county for the reason that both were then in the state of California.

The return of the sheriff of Cascade county shows that he received the summons on October 26, 1946, and that he personally served the same on one named defendant on November 1, 1946, and on another named defendant on November 2, 1946.

On December 9, 1946, the original summons with the above returns thereon was filed with the clerk of court together with the summons published and the printer's affidavit showing such publication and praecipe for the entering of the default of all defendants except Lewis and Clark county and the city of Helena they having appeared by answer.

Defendants contend that the failure to file the original summons with the clerk of court within fifteen days after November 2, 1946, whereon the sheriff of Cascade county made his last service "is a fatal defect to the proceedings." There is no merit in the contention. The mere failure or omission to file the original summons with the various returns thereon within the time specified in section 93-3020, supra, does not affect the district court's jurisdiction in any particular nor is it an irregularity which prevents that court from conducting and completing the quiet title action in a due, orderly and proper manner. No defendant in the suit has been deprived of any right by the failure to sooner file the original summons with the clerk of court. Compare: Haggerty v. Sherburne Mercantile Co., supra; Bourgeious v. Santa Fe Trail Stages, 43 N. M. 453, 95 Pac. (2d) 204; Riker v. Kilinski, 309 Pa. 188, 163 A. 526; Federal Land Bank v. Brinton, 106 Utah 149, 146 Pac. (2d) 200; In re Estate of Newman, 75 Cal. 213, 16 Pac. 887, 7 Am. St. Rep. 146.

This jurisdiction has long been committed to the rule that a valid tax title is a new and paramount title created by the sovereign and that a tax deed given pursuant to a valid and regular tax sale extinguishes titles, liens and collateral interests subordinate to the dignity of the tax lien.

Thus, assuming the tax sale to be valid and regular as the district court adjudged it to be, a new and paramount title free from

all estates and encumbrances was conveyed by the tax deed of October 31, 1929.

*Bonds for Deed.* Notwithstanding these facts defendants object to possible "interests" that may have been derived through three instruments dated March 31, 1873, each termed a "Bond for Deed" and each conferring the right to engage in placer mining on certain described portions of the ground comprising an unpatented placer mining claim the legal title whereof was then vested in the United States Government.

Each "Bond for Deed" shows that it is nothing more than an executory agreement to execute in the future and only after the issuance of patent, a conveyance which would convey to the obligees the mining title being simply the right to mine but expressly reserving bed rock and the title to all the ground after mined out provided, of course, that on or before the day on which the obligor's title be perfected or patent issue to them the obligees shall have paid to the obligors the sum agreed upon.

The records show no deeds by any of the obligors to any of the obligees conveying the mining title to any of the placer ground.

A bond for deed does not purport to convey the title to the obligee. It is not a conveyance of the legal title. It is merely an executory contract to convey and puts no title into the obligee so long as the contract remains executory. When the conditions of the bond are fulfilled by the obligee then and not until then does he have the right to demand a deed of conveyance vesting in him the title to such property as is called for by the contract.

The "Bonds for Deed" here under consideration do not contemplate any conveyance of the title to either bed rock or to the surface rights in any part of the placer mining claim—but on the contrary such title is expressly reserved from the conveyance to be made and executed after patent and upon the performance of the conditions imposed by the bonds. The bonds created no lien on the surface rights so reserved by the obligors but merely created a $1,000 contract liability in the event the obligors should

refuse to allow the obligees to enter upon and mine the described portions of the placer claim.

It was not until May 29, 1879, being more than six years after the execution of the "Bonds for Deed" that patent for the placer claim issued to the four original locators they being the obligors in the bonds.

Had the obligors violated their contract then the obligees or their successors in interest were required to institute suit within eight years to enforce their rights thereunder. The record shows no such suit or proceeding and the right to maintain any such action has long since been barred by the provisions of R. C. M. 1947, section 93-2603.

*Peter Larkin.* Defendants specify as error the district court's finding that Peter Larkin was a single man on April 25, 1876, when he executed an instrument purporting to sell and transfer a specified undivided interest apparently claimed by him by reason of being an obligee named in one of the aforesaid bonds for deed.

The bonds for deed were not conveyances and they passed no title to the obligees hence no title to the land passed by virtue of the sale and transfer by the obligee Larkin.

Should the instrument executed by Larkin in 1876 be treated as a deed to real property the presumption provided for in R. C. M. 1947, section 39-131, must be indulged. Such statute reads: "When a deed to real property has been made, executed and acknowledged prior to the year 1900 by a grantor without recital in the body of the deed or acknowledgment as to whether or not the grantor is married or single, and the wife of such grantor, if any, not joining in the conveyance, or otherwise releasing or conveying her dower, the presumption shall be that the person conveying such land had no wife living at the date of such conveyance and that such land was conveyed free of all right of dower, inchoate or vested." Also see R. C. M. 1947, sec. 93-2504.

"Saml. Schwab." By deed recorded May 31, 1882, an undivided one-quarter interest in the original placer mining claim

was conveyed to "Saml. Schwab" and nine days later the same undivided interest in the same placer claim was conveyed by a deed executed by "Samuel Schwab."

Ten years before either of the above deeds was given this court ▮ held that it is sufficient to describe a party by any known and accepted abbreviation of his Christian name. Kemp v. McCormick, 1 Mont. 420 at page 423. Also see Mining Securities Co. v. Wall, 99 Mont. 596 at page 604, 45 Pac. (2d) 302; R. C. M. 1947, sec. 93-3908; 38 Am. Jur., Name, sec. 8, p. 599.

Every title examiner should know that there are certain standard abbreviations, derivatives and nicknames for the more common Christian names which the courts have long recognized as interchangeable with the full name such as Alex. for Alexander, Bill or Wm. for William, Bob for Robert, Dan for Daniel, Geo. for George, Jno. or Jack for John, Jos. or Joe for Joseph, Saml.—Sam'l or Sam for Samuel, Thos. or Tom for Thomas, etc.

But says defendants' attorney: "There is no presumption that an abbreviation of a man's name is one and the same person whose name is written out." There is little need to rely on any presumption here for the abstract of title shows a duly recorded correction deed to "Samuel Schwab" as grantee executed by the same grantors who gave the first deed to "Saml. Schwab" as grantee and that such subsequently executed correction deed expressly recites: "This indenture is executed for the purpose of correcting certain defects in a deed executed by the said parties * * * which said deed was * * * recorded * * * on the 31st day of May 1882, in Book 'Y' of Deeds, page 120," the deed referred to being the deed running to "Saml. Schwab" grantee.

It is the function of an attorney at law retained to pass upon ▮ a title to determine from the abstract, or from the original records and instruments, if his employment extends to them, where the title rests, and what liens or encumbrances, if any, exist against the property involved. An attorney so employed must be held to have undertaken to use a reasonable degree of care or skill and to possess to a reasonable extent the knowledge

requisite to a proper performance of his duties and he will be held liable to his client for injury resulting as a proximate consequence from the want of such knowledge and skill or from the failure to exercise such care. Such title examiner should be familiar with the statutes and decisions of his own state and he must apply the settled rules of law that should be known to all conveyancers.

The district court's final decree entered December 9, 1946, quieted the plaintiff Clinton's title and adjudged: That he is the true and lawful owner, in fee simple of the described property; that his title is good and valid "and that the title of the said J. H. Clinton thereto is adjudged to be quieted against all claims, demands or pretention of all of the defendants in the caption specifically above named, and all other defendants, and all other persons unknown, which and who are hereby perpetually enjoined, stopped and debarred from asserting or setting up any claim or right of title whatever in or to or claim to or against said land and premises, or any part thereof, or lien thereon, adverse to the said J. H. Clinton."

The foregoing decree became and is final. It may not be collaterally attacked. It specifically adjudges Clinton's title and is determinative not only of his rights in the property but also of the rights of all those who may claim under and through him. The defendants Miller are merely parties to an executory contract of sale and purchase which they refuse to perform. Hence in the instant suit against the Millers the plaintiff Clinton and wife are merely "shadow boxing" with themselves. Clinton and wife most certainly are not entitled to again petition the same court for a second decree to again adjudge Clinton's title to be good and valid and to adjudge counsel's objections to such decreed title to be invalid and that none thereof "casts any cloud upon plaintiff's title" as is prayed for in their complaint in this suit. The Clintons however, are not without an adequate remedy. The contract expressly obligates the purchasers to pay the $400 balance still owing on the agreed purchase

price and a money judgment in such sum doubtless could be obtained in a proper action brought therefor. However, no such money judgment was either sought or given in the instant action.

The entire proceeding is frivolous and an imposition on the courts. The decree entered herein on July 20, 1950, does not and it cannot supply to Clinton any better title than was and is adjudged to him in the decree entered in his quiet title action entered on December 9, 1946. Clinton has a good and merchantable title acquired: (1) Through the deed of conveyance from the Hoffmans; (2) through adverse possession for much longer than the statutory period, and (3) through the valid final decree entered in his quiet title action.

This court finds no merit in the appeal nor in the action and directs that the cause be remanded to the district court with directions to set aside the decree and dismiss the suit, the respective parties litigant to bear their own costs, both in the district court and on appeal. It is so ordered.

MR. JUSTICES METCALF, BOTTOMLY and FREEBOURN, concur.

MR. JUSTICE ANGSTMAN:

I concur in the foregoing opinion so far as it determines the questions of law involved in the case. That part which treats of the duties and liability of attorneys I think is wholly gratuitous and therefore dictum. No issue is presented in this case of the negligence or lack of skill of any attorney.