No. 91-071

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

RICHLAND NATIONAL BANK & TRUST, a National Banking Corporation,

Plaintiff and Respondent,

-vs-

ROBERT A. SWENSON and JUDY A. SWENSON, husband and wife, and B & J DRILLING, INC., a Corporation,

Defendants and Appellants,

RICHLAND NATIONAL BANK & TRUST, a National Banking Corporation,

Plaintiff and Respondent,

-vs-

B & J DRILLING, a Corporation, also known as B & J Drilling, INC.,

Defendant and Appellant.

APPEAL FROM: District Court of the Seventh Judicial District,
In and for the County of Richland,
The Honorable Dale Cox, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

L. Randall Bishop; Jarussi & Bishop, Billings, Montana.

For Respondent:

Thomas M. Monaghan; Lucas & Monaghan, Miles City, Montana.

FILED

AUG 8 - 1991

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on briefs: May 31, 1991

Decided: August 8, 1991

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

The defendants Robert A. Swenson, Judy A. Swenson, and B & J Drilling, Inc., (B & J) appeal the orders of the Montana Seventh Judicial District Court, Richland County, granting summary judgment to the plaintiff Richland National Bank and Trust (the Bank) on the defendants' counterclaims for breach of fiduciary duty, negligence, fraud, tortious interference with business relations and bad faith against the Bank in its action to collect on certain promissory notes executed by the Swensons to the Bank. We affirm.

The defendants raise several issues on appeal, which we restate as follows:

(1) Did the District Court err in concluding that there was insufficient evidence to raise a genuine issue of material fact regarding the defendants' counterclaims of breach of fiduciary duty, negligence, fraud, tortious interference with business relations and bad faith?

(2) Are the default and default judgment entered against B & J void for lack of personal jurisdiction?

(3) Did the District Court err in holding that the Swensons did not have standing to present claims for wrongs to themselves because such claims are the claims of B & J, a corporation of which the Swensons are the sole shareholders?

(4) Did the District Court err in concluding that the plaintiff's counterclaims were compulsory and thus barred by Rule 13(a), M.R.Civ.P.?

(5) Did the District Court err in concluding that the

2

Swensons were not the real party in interest for prosecuting any claim against the Bank because under 11 U.S.C. § 541 (a)(1) the alleged counterclaims became the property of the Swensons bankruptcy estate?

In March of 1975, the Swensons went into the seismic drilling business. They incorporated their business under the name of B & J Drilling in March of 1979 and are the sole stockholders. The Swensons began doing business with the Bank in the fall of 1977 when they purchased a home in Sidney with financing arranged through the Bank. Early in 1978 the Swensons began borrowing money from the Bank for various business purposes. These were short term loans and were regularly paid in full.

On December 29, 1980, Mr. Swenson borrowed $60,000 from the Bank evidenced by a note for one year, to purchase an auger drill and truck. The drill was not transferred to B & J; it remained a personal asset of the Swensons. On December 29, 1981, the note was renewed in the amount of $54,600 for another year. On February 14, 1983, the note was renewed in the amount of $64,650.07, with a final maturity date of June 30, 1984. On August 6, 1984 the promissory note was renewed in the amount of $65,545.43, with a final maturity date of September 28, 1987. The Swensons' last renewal promissory note number 33-4946 provided for monthly payments of $2,338.65 beginning on October 28, 1984, and was signed by both the Swensons. B & J made seventeen monthly payments on this note beginning on November 6, 1984 and continuing through March 10, 1986.

In May of 1985, the Swensons borrowed $7,091.87 to purchase

3

a 1981 Ford truck. They executed to the Bank promissory note number 70-7686 in that amount and gave the Bank a security interest in the truck as collateral. B & J Drilling made nine monthly payments on this note beginning on July 8, 1985 and continuing through March 10, 1986.

On November 15, 1982, B & J began borrowing from the Bank for operating expenses. All of the notes were short term notes.

In November of 1985, B & J borrowed $63,632.49 from the Bank and executed and delivered its promissory note number 33-9670. This note represented the renewal of two prior promissory notes which totaled $43,632.49 and an advance of $20,000. The note was due November 12, 1986, and it was secured under a security agreement of the same date by accounts receivable, equipment, machinery and tools belonging to B & J. The Bank also requested B & J to sign a guaranty for the debts of the Swensons, including note number 33-4946, and to sign a security agreement securing payment of such debts. The security agreement gave the Bank a security interest in various types of collateral, including its accounts receivable from Reliable Exploration, Inc. (Reliable). Reliable was B & J's only customer. B & J had no other source of income.

In November of 1985, B & J received $23,452.50 from Reliable in payment of its August invoice and applied the full amount to promissory note number 33-9670, the operating note. On December 5, 1985, B & J received $21,900 from Reliable for its September invoice. B & J applied only $1,900 to the operating promissory

4

note and deposited the remaining $20,000 in its own checking account. That day the Bank wrote to B & J and informed them that

> In the past we have advanced up to 100% of the current month's invoices for operating. All future borrowings against accounts receivable will be limited to a maximum of 75% of the current month's invoices.

On December 20, 1985, B & J requested and received an operating loan of $20,000. This loan raised the principal of note 33-9670 to $58,744.60.

In January of 1986, B & J received $37,145 from Reliable for its October invoice; it applied the full amount to note 33-9670. Later in January, B & J received $19,013.62 from Reliable for its November invoice. B & J applied $12,000 to the note and used the remainder of the check from Reliable for a transmission replacement.

In February of 1986, B & J requested and received an operating loan from the Bank of $25,000. This raised the principal of note 33-9670 to $35,180.71.

On March 7, 1986, B & J received $32,670 from Reliable and applied it to the operating note. It then requested and received an advance of $20,000 and deposited it into its checking account. The principal of note 33-9670 then totaled $23,006.06.

On April 23, 1986, B & J requested a loan of $8,400. The Bank refused the request. Mr. Swenson then contacted Reliable and requested a direct payment of money in order to keep operating. Reliable sent a check for $12,652.50. B & J deposited this check directly into its checking account and never informed the Bank of this payment. Mr. Swenson testified that he "slid this one by them

5

without them knowing about it right away." B & J made no further loan requests of the Bank.

On August 14, 1986, Mrs. Swenson brought a check to the Bank in the amount of $4,404. In her deposition she explained her actions:

> I owed the bank money, which I owed other people money, too; but in my mind I hated to run to the bank and say, "I want all of that money. You guys aren't getting any of this," like they did to me.
>
> So I think I probably was fair enough to say, "Garth, would you please just give me half of it. You can have half of it. Because I do know I owe you money. Because I've always paid you your money, and I do probably owe you some."

The Bank followed Mrs. Swenson's request and applied approximately half of the check to the Swensons' debt and deposited the remainder in B & J's checking account. Shortly thereafter, the Swensons moved to California leaving behind the auger drill personally owned by them and all the equipment owned by B & J. Before leaving Sidney, Mr. Swenson removed the conventional drill rig belonging to his corporation from the truck upon which it was mounted and substituted it with an inoperative one. He stored the conventional rig on his brother-in-law's place near Richland, Montana. When the Bank inquired about the rig, Mr. Swenson would not answer the inquiries. From January until March of 1987 the Bank sold the collateral belonging to the Swensons and B & J.

The Bank filed suit (Civil No. 15,694) on April 3, 1987 to recover the money owed by the Swensons on notes number 33-4946 and 70-7686 and by B & J on note 33-9670. The Swensons filed a bankruptcy petition on May 7, 1987 protecting them from any

6

judgment in that suit. In the bankruptcy, the Swensons did not list any contingent claims against the Bank. On September 18, 1987, the United States Bankruptcy Court entered its discharge of the Swensons.

B & J failed to respond to the summons and complaint and a default judgment was entered against it on June 15, 1987. The Bank purchased the account receivable owed B & J by Reliable at a subsequent sheriff's sale. On December 16, 1988, B & J moved to set aside its default and the judgment entered against it. On December 19, 1988, the Swensons filed their separate answer and counterclaim in Civil No. 15,694. On February 2, 1989, the District Court entered its order setting aside the default judgment. On February 10, 1989, B & J filed its separate answer and counterclaim.

On November 2, 1987, the Bank filed a second suit (Civil No. 15,915) against B & J seeking to collect the unpaid principal and interest on promissory note 33-4946 and to foreclose the corresponding security agreement. B & J answered and counterclaimed against the Bank.

On April 17, 1989, the parties stipulated to consolidate the suits. The parties conducted extensive discovery and submitted their respective motions for summary judgment. The court granted summary judgment to the Bank on May 1, 1990, concluding that (1) there were no facts to support the counterclaims of B & J and the Swensons against the Bank; (2) the default judgment against B & J was erroneously set aside, thus the counterclaim of B & J was a

7

compulsory counterclaim in the first suit and failure to assert it precluded assertion of it in the second suit; (3) the counterclaims of the Swensons failed to state a claim because B & J's corporate right of action cannot be asserted by its stockholders; and (4) the counterclaims arose out of events taking place before the filing of bankruptcy and thus became the property of the bankruptcy estate, thereby precluding the Swensons from personally maintaining the counterclaims. On February 2, 1990, the defendants filed a motion to amend their counterclaims. Pursuant to the District Court's order of May 7, 1990, the defendants amended and consolidated their counterclaims and the Bank again moved for summary judgment. The court granted the Bank's motion, holding that the amended counterclaims only stated one additional count not considered in its first order, tortious interference with business relations and that there were no facts to support such claim. The Swensons and B & J now appeal raising the aforementioned issues.

## STANDARD OF REVIEW

In order for summary judgment to issue, the movant must demonstrate that there is no genuine issue as to all facts deemed material in light of the substantive principles entitling the movant to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 117, 760 P.2d 57, 60; Cerek v. Albertson's, Inc. (1981), 195 Mont. 409, 411, 637 P.2d 509, 511. If the movant meets this burden, the burden then shifts to the non-moving party to demonstrate a genuine issue

8

of material fact. Frigon, 760 P.2d at 60. "Mere denial or speculation will not suffice, the non-moving party must show facts sufficient to raise a genuine issue." Frigon, 760 P.2d at 60; Gamble Robinson Co. v. Carousel Properties (1984), 212 Mont. 305, 312, 688 P.2d 283, 287. As will be discussed below, B & J and the Swensons have failed to demonstrate evidence sufficient to raise a genuine issue of material fact in light of the substantive principles of law.

I.

**Did the District Court err in concluding that there are no facts supporting the counterclaims of B & J Drilling or the Swensons?**

The defendants counterclaimed against the Bank alleging negligence, breach of fiduciary duty, fraud, tortious interference with business relations and bad faith. The District Court concluded that there were no facts to support these claims and granted summary judgment to the Bank. We agree with the District Court's conclusion.

It is well settled in Montana that "[t]he relationship between a bank and its customer is generally described as that of debtor and creditor . . . and as such does not give rise to fiduciary responsibilities." Lachenmaier v. First Bank Systems, Inc. (Mont. 1990), 803 P.2d 614, 618, 47 St.Rep. 2244, 2246; Deist v. Wacholz (1984), 208 Mont. 207, 216, 678 P.2d 188, 193; Simmons v. Jenkins (1988), 230 Mont. 429, 433, 750 P.2d 1067, 1070. There is a limited exception to this general rule upon proof of "special

9

circumstances," as, for example, where a bank is "thrust beyond the role of a simple creditor into the role of an advisor." Lachenmaier, 803 P.2d at 618, Deist, 678 P.2d at 193. The security agreements entered into between the Bank and B & J and the Bank and the Swensons were entered into as part of the debtor/creditor relationship. The Bank merely exercised rights it had acquired by security agreement and law when it foreclosed on the collateral. There is no evidence that the Bank asserted any influence in the defendants' business. Even assuming that the Bank owed a fiduciary duty, there could be no breach of such duty when the Bank acted for legitimate business reasons in accordance with the security agreements. Lachenmaier, 803 P.2d at 619; see also Tresch v. Norwest Bank of Lewistown (1989), 238 Mont. 511, 778 P.2d 874.

The Swensons also argue that the Bank was negligent in structuring the $60,000 loan for purchase of the auger drill in December of 1980. However, the Swensons cite no authority to support the proposition that a negligence action may be based upon a repayment term of a lawful contract bargained between two parties. Absent the existence of a fiduciary duty, the law does not support such a claim.

Mrs. Swenson also contends that a fraud was committed upon her, and as a result upon B & J, when she signed a security agreement in blank with the Bank. She alleges that the Bank's officer lied to her about what terms would be placed in the security agreement. The Bank admits that the agreement was signed in blank and then completed by the Bank and mailed to B & J. It

10

denies that any fraud or misrepresentation occurred regarding the terms of the agreement. The record indicates that Mrs. Swenson and B & J had the security agreement in their possession in December of 1985, thus she had the means to discover the alleged fraud at that time. The counterclaim of the Swensons was not filed until December 19, 1988. Thus, any action for fraud is barred by the two year statute of limitations. Mobley v. Hall (1983), 202 Mont. 227, 232-3, 657 P.2d 604, 606-7.

The defendants' amended counterclaim also alleges that the Bank tortiously interfered with the Swensons' and B & J's existing and prospective business relationship with Reliable. Defendants contend that this interference occurred when the Bank notified Reliable that it had a specific assignment of accounts receivable from B & J and requested that Reliable issue future payments and drafts with both the Bank and B & J named as payee. The Bank notified Reliable of this prior to notifying B & J that it was exercising this assignment under the security agreement.

The defendants' contention is without merit. In order to establish a prima facie case of tortious interference with business relations, the pleader must show that the acts (1) were intentional and willful; (2) were calculated to cause damage to the pleader in his or her business; (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) that actual damages and loss resulted. Bolz v. Meyers (1982), 200 Mont. 286, 295, 651 P.2d 606, 611. Thus, in order to establish a cause of action, it must be shown

11

that the actor intentionally committed a wrongful act without justification or excuse. Lythgoe v. First Security Bank of Helena (1986), 222 Mont. 163, 165, 720 P.2d 1184, 1185. Here, the Bank was merely exercising its rights to notify account debtors under the security agreement:

> Notwithstanding Secured Party's rights under Section 4 with respect to any and all . . . accounts. . . <u>Secured Party may at any time (both before and after the occurrence of an Event of Default) notify any account debtor . . . that such . . . account . . . has been assigned or transferred to Secured Party for security and shall be paid directly to Secured Party.</u> If Secured Party so requests at any time, Debtor will so notify such account debtors and other obligors in writing and will indicate on all invoices to such account debtors or other obligors that the amount due is payable directly to Secured Party. [Emphasis added.]

The language of the security agreement did not require the Bank to first notify B & J in advance of any notice to Reliable. The District Court did not err in concluding that there were no facts to support the defendants' claim of tortious interference with business relations.

The defendants also argue that the trial court improperly denied their motion for leave to amend their counterclaims to state a cause of action in contract for breach of the implied covenant of good faith and fair dealing. The defendants point out that the trial court essentially concluded that the amendment would be futile and denied the motion, in effect converting the motion into one for summary judgment.

This Court recently defined the scope of the implied covenant of good faith and fair dealing in Story v. City of Bozeman (1990), 242 Mont. 436, 791 P.2d 767. We held that the implied covenant

12

exists in every contractual relationship. A breach of the covenant is a breach of the contract. The standard of compliance is "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Section 28-1-211, MCA; Story, 791 P.2d at 775. We further held that

> [e]ach party to a contract has a justified expectation that the other will act in a reasonable manner in its performance or efficient breach. When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.

Story, 791 P.2d at 775. Thus, a breach of the covenant may be found when the "discretion conferred by the contract" has been misused to deprive the other party of the benefit of the bargain. See e.g. Nicholson v. United Pacific Insurance Co. (1985), 219 Mont. 32, 710 P.2d 1342.

According to the Bank, it refused B & J's April 23, 1986, $8,400 loan request because B & J's only customer and sole source of income for repayment of the loan, Reliable, was 84 days late in its payments to B & J and appeared incapable of paying its bills. Therefore, the Bank believed that sound business judgment warranted that it not make the loan. Had the loan been granted, it would have been under the terms of an existing line of credit as evidenced by the promissory note from B & J to the Bank dated November 12, 1985, that provided:

> All advances including readvances of all sums repaid hereunder, now or hereafter made by Bank Payee shall be evidence [sic] by this note or a similar note. This note does not constitute a commitment by the Bank to make readvances or future advances, but may be done at Bank's discretion.

13

The plain language of the note gave the Bank the discretion to deny future loan requests and there is no evidence that such discretion was misused to deprive the Swensons and B & J of the benefit of their agreement.

In _Story_ we noted that while the damage award in the seminal case of _Nicholson_ was excessive in the typical contract case, its reasoning was still sound. _Story_, 791 P.2d at 775. In _Nicholson_, the parties entered a lease agreement which provided that the plaintiff would remodel an office to the defendant's satisfaction. During the remodeling the defendant decided to forego the new office and attempted to force the plaintiff to breach by repeatedly denying satisfaction with the remodeling rather than efficiently breaching the lease agreement and paying the plaintiff contract damages. While the tort damages awarded in _Nicholson_ are now controlled by _Story_, the case is a good example of breach of the honesty in fact standard. The distinctions between the case at bar and _Nicholson_ are clear. Here the allegations of breach of the implied covenant of good faith and fair dealing are purely speculative. There is no evidence of another motive for the Bank to deny the loan other than sound business reasons.

The District Court granted summary judgment in favor of the Bank on defendants' counterclaims on May 7, 1990. The court had granted the defendants leave to amend their counterclaims on May 1, 1990. The defendants moved to amend their counterclaims a second time to state a cause of action pursuant to _Story_ on June 7, 1990, _after_ the court had issued its first order on the original

14

counterclaims. The court issued its second order granting the Bank summary judgment on the amended counterclaims on October 18, 1990, along with an order and supplemental memorandum denying leave to file a second amended counterclaim stating a cause of action under Story.

Rule 15(a), M.R.Civ.P., instructs a district court that leave to amend the pleadings shall be freely given when justice so requires. The rule has been interpreted liberally, allowing amendment of pleadings as the rule and denying leave to amend as the exception. Priest v. Taylor (1987), 227 Mont. 370, 377-8, 740 P.2d 648, 653. One exception to the general rule is when the amendment would be subject to dismissal. Walstad v. Norwest Bank of Great Falls (1989), 240 Mont. 322, 324, 783 P.2d 1325, 1326. Here the defendants, after discovery, failed to raise sufficient facts under Story to withstand a motion for summary judgment. The District Court did not abuse its discretion in denying the defendants leave to amend their counterclaims under Story.

II.

**Are the default and default judgments entered against B & J void for lack of personal jurisdiction?**

On April 15, 1987, Robert A. Swenson was the registered agent for service of process for B & J. He had moved his domicile to California. On that day he was personally served with process by a deputy sheriff of Sacramento County, California. The sheriff's return shows the Swensons had been served only as individual defendants; it does not indicate that B & J or an agent thereof was

15

served. Nevertheless, the District Court concluded that B & J was properly served with process and it failed to enter the required appearance within the time specified by law. Its default was entered.

B & J alleges that the judgments against it are void because of lack of personal jurisdiction over the corporate entity. It relies on Shields v. Pirkle Refrigerated Freight Lines, Inc. (1979), 181 Mont. 37, 591 P.2d 1120, and Sink v. Squire (1989), 236 Mont. 269, 769 P.2d 706. The facts of these cases are distinguishable from the case at bar. Shields involved failure by a party to properly carry out "substituted service" upon the secretary of state. Sink involved failure to comply with mandatory service requirements applicable to the contents and form of a summons. On the other hand, this case involves an alleged fatal defect in the return executed by a sheriff acting as a process server.

Rule 4D, M.R.Civ.P., governs service of process on defendants. It provides several methods of serving a corporation. The fact that the registered agent cannot be found in Montana does not require use of substituted service. "Where service upon any person cannot, with due diligence, be made personally within this state, service of summons and complaint may be made by service outside this state in the manner provided for service within this state, with the same force and effect as though service had been made within this state." Rule 4D(3), M.R.Civ.P. One such method of effecting service upon a domestic corporation is by delivering a

16

copy of the summons and complaint to the registered agent of the corporation named in the records of the secretary of state or an agent authorized by the corporation to accept service of process. Rule 4D(2)(e), M.R.Civ.P.

We conclude that there was no error in service of process in this case. The sheriff or other process server does not determine a defendant's capacity to receive process. Here, Mr. Swenson's capacity as the registered agent of the corporation exists as a result of law (see § 35-1-305, MCA) and B & J's designation and his consent to act as its registered agent. Moreover, it is the fact of service rather than the proof of service that is the focus of a determination of personal jurisdiction:

> Indispensable to the timely prosecution of an action is the service of the summons and complaint. Service of the summons is the means by which the district court acquires personal jurisdiction over the defendant. Clinton v. Miller (1951), 124 Mont. 463, 478, 226 P.2d 487, 495; Haggerty v. Sherburne Mercantile Co. (1947), 120 Mont. 386, 392, 186 P.2d 884, 889. Service is also essential to due process as it notifies the defendant of the pendency of an action against him thereby giving him the opportunity to defend himself or his property. Clinton, 124 Mont. at 478, 226 P.2d at 495; Haggerty, 120 Mont. at 396-97, 186 P.2d at 891.

> Filing the return, on the other hand, is simply a ministerial act. The return itself is merely evidence of service of the summons and complaint. Clinton, 124 Mont. at 479, 226 P.2d at 495. It is filed with the court only to document on the record the fact that service has been completed.

> . . .

> [O]ther rules governing proof of service provide that "[f]ailure to make proof of service does not affect the validity of the service." Rules 4D(8)(e) and 5(f), M.R.Civ.P.

Livingston v. Treasure County (1989), 239 Mont. 511, 513, 781 P.2d

17

1129, 1131.

In the case at bar, the District Court adopted the reasoning in the case of Fisher v. Crest Corp. (Idaho App. 1987), 735 P.2d 1052. In Fisher, a default judgment was obtained against a corporation and a subsequent motion to set the default aside was denied. The district court reversed and set the default aside. The Idaho Court of Appeals reversed the district court. It held that service of process was adequate to confer jurisdiction over the defendant corporation even if only one copy of the documents had been served upon the defendant corporate officer as both an individual and defendant corporate officer. Fisher, 735 P.2d at 1055. We find the holding of Fisher persuasive. As in Fisher there are no allegations or record of the corporate officer being misled by the service. We conclude that the District Court had the necessary personal jurisdiction over the defendant B & J to enter its default.

### III.

**Did the District Court err in holding that the Swensons did not have standing to present claims for wrongs to themselves when those claims are the claims of B & J, a corporation of which the Swensons are the sole shareholders?**

The Swensons contend that they are entitled to present claims on behalf of their sole proprietorship. They argue that they were doing business with the Bank in a personal as well as a corporate capacity. The District Court concluded that such claims were essentially those of their corporation and held that the Swensons

18

as individual shareholders could not prosecute the claims of the corporation.

We agree. Montana law is clear that the stockholders and guarantors of a corporation do not have the right to pursue an action on their own behalf when the cause of action accrues to the corporation. Bottrell v. American Bank (1989), 237 Mont. 1, 26-7, 773 P.2d 694, 709-10; Walstad, 783 P.2d at 1328; Moats Trucking Co., Inc. v. Gallatin Dairies, Inc. (1988), 231 Mont. 474, 477, 753 P.2d 883, 885. Here, B & J borrowed operating funds from the Bank; the Swensons as individuals did not borrow operating funds but had borrowed from the Bank to purchase a truck. Nor did the Swensons as individuals request a loan related to the auger rig since it was refinanced in 1984. The corporate entity, B & J Drilling, was requesting an advance for operating funds under its promissory note 33-9670. The Bank properly exercised its contractual right and refused this requested advance. The District Court correctly concluded that the Swensons as individuals are precluded from asserting any cause of action arising from this refusal by the Bank to continue financing B & J.

IV.

Finally, our affirmation of the District Court on the above issues is sufficient to uphold the District Court's grant of summary judgment to the Bank. Because the Swensons have failed to present evidence sufficient to raise a genuine issue of material fact regarding their counterclaims, we need not determine whether the Swensons are the real party in interest to assert those

19

counterclaims or whether such counterclaims are compulsory and thus barred under Rule 13(a), M.R.Civ.P.

The order of the District Court is

**AFFIRMED.**

/s/ R.C. McDonough
Justice

We concur:

/s/ J.A. Turnage
Chief Justice

/s/ John Conway Harrison

/s/ Karla M. Gray

/s/ Terry Trieweiler
Justices

20

August 8, 1991

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

L. Randall Bishop
JARUSSI & BISHOP
P.O. Box 3353
Billings, MT  59103-3353

Thomas M. Monaghan
LUCAS & MONAGHAN, P.C.
P.O. Box 728
Miles City, MT  59301

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
        Deputy