No. 85-257

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

SAFECO INSURANCE COMPANY,

        Plaintiff and Appellant,

-vs-

GEORGE ELLINGHOUSE,

        Defendant and Respondent.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable William Speare, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Williams Law Firm; Richard Ranney argued, Missoula,
Montana
Landoe, Brown, Planalp & Kommers; Gene I. Brown argued,
Bozeman, Montana

    For Respondent:

        Anderson, Edwards & Molloy; Richard W. Anderson argued,
Billings, Montana

---

Submitted: May 13, 1986

Decided: September 17, 1986

Filed: SEP 17 1986

_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This cause of action arose in the District Court of the Thirteenth Judicial District of the State of Montana in and for the County of Yellowstone. The cause began as a declaratory judgment action September, 20, 1982. Plaintiff, Safeco Insurance Company, filed suit against defendant, George Ellinghouse, to determine whether Ellinghouse had liability coverage under his Safeco policy in a suit then pending against him and others for the June, 1977, death of Raymond A. Taylor in Glendive, Montana. Ellinghouse answered alleging coverage and counterclaimed against Safeco for actual and punitive damages for bad faith, fraud, misrepresentation, and breach of the insurance contract. We reverse, unless remittitur is accepted as provided.

The coverage question and the counterclaim were tried to a jury. After hearing all the evidence the District Court ruled there was coverage as a matter of law and so instructed the jury. Thus, only the bad faith counterclaim was presented to the jury, which found for Ellinghouse and awarded him $25,000 plus accrued interest in economic damages, $200,000 for emotional damages, and $5,000,000 punitive damages. Judgment was entered and Ellinghouse's claim for attorney's fees was reserved for later hearing. The District Court denied Safeco's motion for a new trial and judgment notwithstanding the verdict.

George Ellinghouse was self-employed under the name Turf-Aid Distributing Company in 1973. The business involved the sale of industrial equipment to golf courses, parks and cemeteries for the maintenance of large turf areas. Early in 1974 Ellinghouse provided consultation services for the

installation of a sprinkler system at a golf course in Glendive, Montana. The system was fully installed and Ellinghouse completed all his operations for the project by mid-1974.

In June, 1977, Raymond Taylor died while working on this golf course, allegedly by electrocution while digging up a leak in the underground sprinkler system near certain underground electrical lines. At the time of the accident, Ellinghouse carried a Safeco insurance policy insuring his business premises for property damages, and affording him $100,000 in liability coverage. It is undisputed this policy was in full force and effect at the time of Taylor's death. The policy, however, contained an exclusion for "completed operations" coverage. In April, 1980, Taylor's widow filed suit in Dawson County, Montana, for Raymond Taylor's death, naming six defendants, including Ellinghouse.

Ellinghouse's insurance agent in Billings, Montana, forwarded notice of the claim and the legal papers served on Ellinghouse to Safeco's office. Safeco initially accepted coverage of the claim without question, and retained attorney Lon Holden of Great Falls, Montana, to defend Ellinghouse. All parties involved at that time assumed Ellinghouse had coverage under the Safeco policy and acted accordingly. Holden had $100,000 in liability coverage with which to negotiate.

In August, 1981, Charles Hodge of Safeco's home office in Seattle, reviewed the Ellinghouse file and discovered the case involved a business operation which had been completed three years before Taylor died. Hodge issued a memo to other Safeco officials noting Ellinghouse's policy contained a "completed operations" exclusion and thus, in his opinion,

3

there was no coverage under the policy. Ellinghouse was not informed of that discovery until he received a coverage denial letter in November.

In October, 1981, a Safeco adjuster presented a "non-waiver" agreement to Ellinghouse which he signed, despite the fact Lon Holden, the attorney retained by Safeco to defend him, was not consulted about the non-waiver document. The adjuster testified that he explained to Ellinghouse at this time there were coverage problems and that the non-waiver agreement would preserve both Ellinghouse's and Safeco's rights under the policy. Ellinghouse denied the adjuster had explained anything about coverage problems at this meeting.

In November, 1981, eighteen months after Safeco had accepted the Taylor claim without reservation, and two months before the original trial date of January, 1982, Safeco formally denied coverage by letter to Ellinghouse. This letter quoted in full two exclusions in the policy upon which Safeco relied for denial of coverage. The first exclusion was the "completed operations" exclusion originally discovered by Hodge at Safeco's home office. The second exclusion was the "away from the designated premises" exclusion and, unlike the "completed operations" exclusion, was not part of the original policy. Safeco later admitted at trial it was wrong in relying on the "away from the designated premises" exclusion, because this exclusion did not have the proper endorsement of Ellinghouse to be effective. The denial letter stated that Safeco would continue to provide legal defense for Ellinghouse, but would not be responsible for any subsequent judgment entered against him, or any settled negotiations. None of the other

4

defendants' counsel were notified of this denial of coverage until February, 1982.

At this point Ellinghouse retained personal counsel. The trial date originally set for January, 1982, was vacated, and the trial re-set for May, 1982. It was vacated again and never re-set. In April, Taylor's attorney offered to settle the entire lawsuit for $165,000, including $50,000 for the claim against Ellinghouse. Ellinghouse forwarded the $50,000 offer to Safeco and demanded that it reinstate his policy and pay the offer. Safeco refused. When Safeco filed its declaratory judgment action in September, all the defendants in the Taylor case except Ellinghouse had reached a settlement.

In March, 1983, Ellinghouse asked Safeco's attorney, Holden, to withdraw from the case and requested his file. Shortly thereafter, Ellinghouse and Taylor reached a $25,000 cash settlement and agreed Taylor was to receive the first $45,000 of any net proceeds recovered by Ellinghouse from Safeco. Ellinghouse borrowed $25,000 from a bank and executed a trust indenture on his home. A few days later, Safeco re-entered the picture and offered $50,000 to Ellinghouse to fund settlement of the Taylor claim, believing the original settlement offer to be open. Safeco was informed Ellinghouse had settled the claim himself.

In making its $50,000 offer to Ellinghouse, Safeco suggested that if Safeco lost the declaratory action, it would pay all of Ellinghouse's defense costs, but if Safeco won, Ellinghouse would owe it $50,000. This offer was not contingent on a dismissal or compromise of Ellinghouse's counterclaim. Safeco was informed the offer was too late, due to the settlement made by Ellinghouse.

The three major issues presented to this Court are whether the District Court erred in directing a verdict on the issue of coverage; whether certain prejudicial instructional and evidentiary errors prevented Safeco from receiving a fair trial; and whether the punitive award was excessive or unconstitutional, and the emotional distress award improper or excessive.

Safeco's position is there was no coverage under the terms of the policy itself. The only two grounds on which it could be held to have any duty to extend liability coverage to Ellinghouse are the ambiguity of the policy terms or estoppel to deny coverage. Waiver and estoppel were the bases for the District Court's ruling there was coverage as a matter of law.

Safeco argues the District Court erred in its ruling that Safeco was estopped to deny coverage to Ellinghouse as a matter of law. We affirm the District Court's action. Safeco's position is Ellinghouse failed to prove each essential element of the affirmative defense of estoppel, especially the last element: "the party must in fact have acted upon it [conduct of the other party] to his detriment." Matter of Shaw (Mont. 1980), 615 P.2d 910, 914. Safeco argues Ellinghouse did not prove by clear and convincing evidence he was worse off because Safeco denied him coverage in November, 1981, than he would have been had it denied coverage immediately. Alternatively, if there were some evidence by which a jury might have concluded Ellinghouse was prejudiced, that evidence should have been presented to a jury for its determination. We find no merit in this argument.

6

We adopt the general rule in an insurance estoppel case as set forth in 14 Couch, Insurance 2d, § 51.85 (2d ed. 1982), as follows:

> Where an insurer, without reservation and with actual or presumed knowledge, assumes the exclusive control of the defense of claims against the insured, it cannot thereafter withdraw and deny liability under the policy on the ground of noncoverage, prejudice to the insured by virtue of the insurer's assumption of the defense being, in this situation, conclusively presumed . . . the loss of the right of the insured to control and manage the case is itself prejudicial.

This rule was deliberately ignored by Safeco's home office.

Further, the Montana Unfair Trade Practices Act requires that the insurer ". . . promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim . . . " Section 33-18-201(14), MCA. See also, 38 A.L.R.2d 1148.

Finally, the Washington case of Transamerica Ins. Group v. Chubb and Son, Inc. (Wash. 1976), 554 P.2d 1080, is particularly important to the question of estoppel. In Chubb the insureds were defended without reservation of rights for ten months before the insurance company backed out of the case. It was estopped to deny coverage for three reasons: (1) Before backing out of the case the company had undertaken and conducted the defense for ten months, thereby depriving the insureds "of their valuable right to retain private counsel;" (2) if the insureds were not protected by the policy, they then had the "right to arrange for the initial investigation, settlement negotiations and conduct of the lawsuit[;]" and (3) there was a potential conflict of interest on the part of the retained defense attorney

vis-a-vis the insured. The Washington court found a presumption of prejudice and granted summary judgment.

The court said:

> The course cannot be rerun, no amount of evidence will prove what might have occurred if a different route had been taken. By its own actions, Federal irrevocably fixed the course of events concerning the law suit for the first 10 months. Of necessity, this establishes prejudice.

Chubb, 554 P.2d at 1083.

The record here speaks for itself concerning Safeco's activities during the eighteen months before it withdrew from the case. Safeco's activities were neither legitimate, nor did they result from mistake. Testimony indicates considerable investigation had been carried on by August, 1981, and that high level officials were aware of the circumstances of this case. A note in the file from Robert J. McCorkle, a claims adjuster in Billings, dated August 12, 1981, says "Frank Smith says hold off any further discovery--home office sees a coverage problem re: completed coverage! Now? You're kidding!" This was fifteen months after Safeco began handling the case and had appointed Lon Holden as counsel. As a result of this note and other conversations, McCorkle wrote to Safeco division headquarters in April, 1982:

> . . . as we discussed, I am quite concerned about the eventual outcome of this matter . . . considering Montana's reputation in recent years, I wouldn't be surprised to see the Montana courts disregard fact all together.

McCorkle was cross-examined at trial about the memo, specifically on "Montana's reputation.":

> Q. Well, I think you say,. . . "I wouldn't be surprised to see Montana Courts disregard fact all together." Are you saying that the courts in this state

8

disregard the facts of a case? That's what your telling Mr. Smith, aren't you?

A. Well, in reference to the Supreme Court, yeah, it's my opinion that they have been known to disregard that sometimes.

Later McCorkel again warned Smith of Safeco's dangerous course where he noted:

As indicated in their correspondence, several of them [lawyers involved in the Taylor case] are also convinced that Safeco will immediately pay Mr. Ellinghouse's share of the settlement amount—and possibly a whole lot more. (Emphasis in original.)

A memo written by Smith two days later said, "I feel we really need to look at our position on indemnity given the law that has been presented."

A telephone conversation with Lon Holden April 19, 1982, indicates that Holden told Smith, "Insured getting restless—I feel it appropriate that the Company have an attorney look at your decision . . . "

Even before Safeco announced its repudiation, Frank Smith was forecasting the consequences for the guidance of the home office:

If we were to totally deny the claim and withdraw defense at this point we would seriously jeopardize our insured's position, etc. and I feel incur a lawsuit, which in Montana would be decided in favor of the insured.

Smith did not give up. Six months before Safeco filed its "good faith" declaratory judgment action, he advised a superior:

After going through the various briefs, etc. it does appear to me that we do have a serious problem as to whether we prejudiced the insured's rights to retain personal counsel and whether, in fact, we did create estoppel when we did not advise the insured of the coverage problem when we initially accepted defense of the matter.

9

Safeco cites several cases in defense of its argument there was no estoppel here. O'Neill Investigations v. Illinois Emp. Ins. of Wausau (Alaska 1981), 636 P.2d 1170; R. A. Hanson Co., Inc. v. Aetna Casualty & Surety Co. (Wash. 1976), 550 P.2d 701. We are not persuaded. While it is true none of these cases found no estoppel, the time element was considerably shorter in all of them, and in O'Neill the insurer had not actually commenced control of the action.

In making its argument against estoppel, Safeco failed to mention a controlling statute, § 26-1-601, MCA, which provides:

> The following presumptions are conclusive:
>
> (1) the truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act, or omission, whenever he has, by such declaration, act, or omission, intentionally led another to believe a particular thing true and to act upon such belief; . . .

Here, Safeco's acts went beyond confirmation letters to the insured. They included an answer to an interrogatory that coverage was in effect. The answer was filed with the court and remained unchanged for eighteen months. Safeco allowed Ellinghouse to rely upon statements and matters of court record, and is now estopped to deny the existence of the same. "The rule is that parties are bound by and estopped to controvert admissions in their pleadings." Fey v. A. A. Oil Corp. (1955), 129 Mont. 300, 323, 285 P.2d 578, 590.

The purpose of estoppel is ". . . to promote justice, honesty, fair dealing and to prevent injustice." Morris v. Langhausen (1970), 155 Mont. 362, 368, 472 P.2d 860, 863. Clearly that purpose was accomplished when the court properly applied the doctrine of estoppel.

It should be noted while Ellinghouse's original answer to Safeco's complaint alleged waiver, and the trial court found waiver, Safeco makes no issue of the problem of waiver on appeal. It is a well established principal of appellate review that:

> The judgment of the District Court is presumed to be correct and it will be upheld unless clearly shown erroneous; the burden of such showing is upon the appellant.

Schuman v. Study Commission of Yellowstone County (1978), 176 Mont. 313, 315, 578 P.2d 291, 292.

Safeco argues that even if it is held there was coverage as a matter of law, the coverage question was in fact a legitimate issue for argument, and Safeco therefore was not in bad faith or liable for punitive damages for denying coverage or seeking to litigate this question.

It is generally held that an insurer is entitled to challenge a claim on the basis of debatable law or facts and will not be liable for the bad faith or punitive damages for denying coverage if its position is not wholly unreasonable. St. Paul Fire and Marine Ins. Co. v. Cumiskey (Mont. 1983), 665 P.2d 223, 40 St.Rep. 891; Nationwide Mut. Ins. Co. v. Neville (Ind. 1982), 434 N.E.2d 585; American Interstate Insurance Co. of Georgia v. Revis (Ga. 1980), 274 S.E.2d 586.

Safeco has the misconception that the mere filing of a declaratory judgment action somehow erases any possible wrongs which preceeded or followed it. The filing of such an action does not erect a judicial shield against accountability. Safeco fails to consider the facts giving rise to the punitive damage issues in this case --facts not found in any other case that has been reviewed by this Court, and which will be discussed infra.

11

Safeco next contends it did not get a fair trial for a variety of reasons. It argues the court should have told the jury why there was "coverage," and that Safeco's legal position was not frivolous. Nor should the court have allowed attorney witnesses to instruct the jury on the law.

Waiver and estoppel were the bases for the District Court's ruling there was coverage as a matter of law. Instruction 43 instructed the jury that:

> [T]he court has, as a matter of law, determined that George Ellinghouse's Safeco insurance policy provided him with full coverage, to his limits of $100,000 for the death of Raymond Taylor, and that the exclusions alleged by Safeco do not, in any sense, defeat that coverage.

Safeco argues that in submitting such an instruction to the jury the trial court must have found no coverage under the policy itself, although this was never explicitly stated by the court. In addition to instruction 43, the court instructed the jury in instruction 24 that:

> You are instructed as a matter of law that in this case, George Ellinghouse's insurance policy was in full force and effect and that his premiums were paid.

The court did not instruct the jury that Safeco had raised reasonable legal arguments in its declaratory judgment action or that the basis of the ruling was estoppel. It is Safeco's position the court's instructions, in fact, clearly implied there was not the slightest merit in its argument the exclusions denied coverage and their position was frivolous as a matter of law.

Safeco next argues that assuming there was no merit in the exclusions it alleged and that its position was frivolous as a matter of law, Ellinghouse was not prejudiced. Such a statement flies in the face of the evidence. Examples of Safeco's egregious conduct clearly shows prejudice in fact:

(1) The non-waiver agreement extracted by deceit was used against the insured in the declaratory judgment action.

(2) Ellinghouse was denied the opportunity to conduct his own early and independent investigation of the facts against him.

(3) Ellinghouse, unaware of the coverage question gave a deposition in the death case November 4, 1980, which McCorkle later used against him to support the coverage denial.

(4) For the first eighteen months after the suit, Safeco claimed the right to exclusive control of settlement under the policy, and then declined settlement offers made within the policy limits without informing Ellinghouse of his resultant and personal risk or immediate need for private counsel.

(5) Discovery in the Ellinghouse defense was cut back by Safeco's direction to Holden not to incur any additional fees. There is no indication in the record what preparations were sacrificed because of this direction.

(6) In a pleading directed to the District Court, June 18, 1981, Holden stated he would file an Ellinghouse motion for partial summary judgment "certainly no later than a date shortly after November 12, 1981." Coverage was denied on November 9, 1981. No motion for summary judgment was ever filed.

(7) By never sending a reservation of rights notice, Safeco was permitted to arrange and announce its surprise denial of coverage to an unsuspecting insured whose advance opportunity to demand and protect his rights was forever lost.

13

(8)  Had Safeco respected its legal duty, Ellinghouse would never have had to borrow $25,000 or mortgage his house.

(9) Safeco's claims division supervisor early recognized the prejudice to Ellinghouse.

There is no need to comment on these examples.  They speak for themselves.  It is difficult to imagine situations more illustrative to support the court's determination there was prejudice in fact.

Safeco next argues that the court's instructions, which implied that Safeco's position was frivolous as a matter of law, were reinforced by attorney testimony, which in effect, similarly instructed the jury.  Despite vigorous objections to admission of this testimony, the court admitted a letter to Safeco from attorney Randy Bishop, stating that in Bishop's opinion the law was clear that "in more than thirty jurisdictions" the principles of waiver and estoppel would apply to the facts of this case, and this was a rule of "general acceptance."  Mr. Bishop was allowed to present detailed opinion testimony on the coverage question, stating it was a general principle of law that prejudice was always presumed to exist whenever a representation of coverage had been made and a defense provided, that the "courts are quite unanimous in saying that insurance companies must either deny coverage immediately or thereafter be estopped from doing so," and that the "completed operations" exclusion had "no application" to this case.

Safeco further contends Mr. Bishop's opinion on the applicable law was enhanced by the testimony of Ellinghouse's expert witness, attorney James Robischon.  Robischon concurred with Bishop, and testified that Mr. Bishop is reputable, competent, highly skilled and experienced and that

14

Safeco was wrong in not following in his "advice." Safeco argues he gave legal opinion that Safeco was completely wrong in denying coverage, especially when they did so; testified in detail as to what the legal effect of the non-waiver was; and what legal duties were imposed upon Safeco in this case. Safeco did not call other attorney experts to give their opposite opinions of the law. Safeco's position concerning expert attorney witnesses is that it is the duty of the court to instruct the jury on the law, and is the duty of the jury to decide the facts of the case.

Safeco relies on § 25-7-102, MCA: "all questions of law, including . . . the construction of statutes and other writings, . . . are to be decided by the court . . . and all discussions of law are to be addressed to the court." Safeco also notes that Rule 704, M.R.Evid., provides that opinion evidence "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The Commission Comment to that rule states "the Commission intends this rule to follow the existing Montana practice of not allowing a witness to give a legal conclusion, or to apply the law to the facts in his answer." Admission of opinion testimony as to the legal effect of a contract is erroneous. Energy Oils, Inc. v. Montana Power Co. (9th Cir. 1980), 626 F.2d 731. This is a correct statement of the rule and we apply it in this case.

Ellinghouse cites several Montana cases which it contends open the door for this type of testimony. None of the cases cited, however, allows attorney testimony as to the law, nor will we allow it here. To do so would be to dispense with Rule 704, Mont.R.Evid., and statutory and case law. No cases from other jurisdictions were cited and we

15

find none. We find no abuse of discretion in allowing attorneys to appear as expert witnesses for the purpose of stating their opinion on an insurer's duty to evaluate the facts, on what constitutes a reasonable evaluation of the facts, or on and how an insurer should have approached the negotiations with the plaintiff.

In view of the holding by the trial court that there was coverage as a matter of law, we conclude that counsel's testimony regarding the law of the case does not constitute reversible error under the unique facts of this case. In so holding, we do not endorse in any way the use of attorneys' testimony for this purpose. As a general rule, an attorney cannot advise the jury as to the law of the case.

Safeco next contends the jury should not have been permitted to hear evidence of its post-settlement activity because much of the evidence was not relevant to any issue in the case and was highly prejudicial. In view of the record, however, we find no merit in this contention, as the evidence is relevant to show malice.

> The essence of the cause before the Court is failure to deal fairly and in good faith with an insured and as such, the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether that standard had been breached or not.

Timmons v. Royal Globe Ins. Co. (Okla. 1982), 653 P.2d 907, 917.

Safeco's trial counsel, however, did not object when certain of this evidence was admitted. Safeco's offer letter, Ellinghouse's rejection letter, Lon Holden's billing slips and a letter pleading for Holden's files were received without objection. Holden was examined without objection about the suit to obtain those files. Safeco's pre-trial

16

memorandum contended that its ". . . offer of $25,000 made on March 12, 1984, was a discharge of its duties of indemnity." Both sides knew that recent events are relevant in bad faith litigation. Smith v. American Family Mut. Ins. Co. (N.D. 1980), 294 N.W.2d 751; Farmers Ins. Exchange v. Schropp (Kan. 1977), 567 P.2d 1359. Again, the facts speak for themselves. Safeco cannot expect to try to exonerate itself at trial with evidence of a change of heart and then take exception when the attempt backfires.

Safeco also objects to the numerous instructions refused by the court. We have carefully considered the instructions offered and find them to be both cumulative and repetitive of other instructions given. In the law of insurance bad faith litigation, "Instructions should be weighed as a whole, and no District Court may be reversed where the instructions, read one with another, and in the context with each other, fully define the issues involved, including damages." Gibson v. Western Fire Ins. Co. (Mont. 1984), 682 P.2d 725, 741, 41 St.Rep. 1048, 1065.

Safeco contends it should not be punished for Lon Holden's alleged improprieties or breach of duties. In this regard, the jury was instructed on this issue as follows:

An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called "agency."

You may find from the evidence that attorney Holden was Safeco's agent even though he was hired by Safeco to conduct the defense of George Ellinghouse. If you find attorney Holden was the agent of Safeco, then you must find that Safeco is responsible for all of the acts done by attorney Holden within the scope of his employment and it is responsible for them. The mere fact that Holden is an attorney at law does not excuse Safeco from responsibility.

17

Safeco's argument it should not be charged with its attorney's actions, but rather that Ellinghouse has a remedy in a separate action against attorney Lon Holden, comes close to being part of the twilight zone. Safeco sold the policy, accepted coverage for months, hired Holden and then repudiated coverage.

Safeco attempts to characterize Holden as an independent contractor, thereby absolving itself from liability for any mistakes he may have made. The attempt fails. Safeco cannot insulate itself from its own bad faith simply by renouncing an agency relationship.

This issue was well reasoned by Federal Judge William Jameson in a case on point from Montana. Judge Jameson concluded the attorney is an agent of the insurance company. The provisions of an insurance contract which give the insurance company the right and impose a correlative duty to defend suits against the insured have the effect of placing absolute and exclusive control over the litigation in the insurance carrier. The authorities agree the insurance carrier has "the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interests of the parties." [Citing cases.] Jessen v. O'Daniel (1962), 210 F.Supp 317, 331. Judgment affirmed, Nat. Farmers Union Property & Casualty Co. v. O'Daniel (1964), 329 F.2d 60, 65.

Safeco raises the issue of the testimony of Melvin O. Senst, one of its former claims adjusters. Safeco alleges that Senst was not revealed as a witness until ten days after discovery had been closed, eleven days before trial, and three days before the pre-trial order was submitted, all of which was in violation of the court's orders.

18

The testimony was offered to show Safeco's general business practice as required to prove violation of the Unfair Claims Settlement Act, § 33-18-201, MCA. Safeco alleges it did not conduct any discovery on the issue of its general business practice and was not prepared to meet it. Although Senst had not worked for Safeco for fifteen years, he was allowed to testify that on five to eight occasions during this period he was dispatched by Safeco's home office to obtain a "non-waiver" from Safeco insureds who had been sued and for whom Safeco had provided coverage and defense for a period of time. He testified he was not instructed to tell the insured there were coverage problems and that in no case was an attorney present even though Safeco had provided an attorney for the insureds. Signing the "non-waiver" was the "kiss of death" as far as coverage was concerned. He could not recall any of the names of the insureds, parties or attorneys involved.

The district court judge recognized that this "testimony is explosive before a jury," and after hearing it in chambers sustained the objections to it and then reversed himself and allowed it. Whether this evidence was properly admitted is one of the closest calls this Court has made in some period of time. The rule has been properly set forth:

> In determining whether evidence is too remote to be relevant, the trial court is not guided by any fixed rules. Rather, the nature of the evidence and the circumstances of the particular case must control. [Citations omitted.] For this reason, the determination of remoteness is left in great part to the trial court's discretion. [Citations omitted.] The trial court's determination of relevancy is subject to review only in case of manifest abuse. [Citations omitted.]

Preston v. McDonnell (Mont. 1983), 659 P.2d 276, 277, 40 St.Rep. 297, 299.

Remoteness goes to the weight and not the evidentiary value of the evidence. There is no showing Safeco was unfairly prejudiced by admission of testimony. We find no manifest abuse in its admission.

Finally, we consider the $5,000,000 punitive damages award and $200,000 emotional damages award. The punitive damages award is 20,000% above the award of $25,000 for economic damages caused Ellinghouse. It is 5,000% more than the $100,000 maximum of the insurance policy, for which Safeco should have settled this case.

The trial court awarded damages of $200,000 to Ellinghouse for emotional distress, in opposition to which Safeco advanced the argument of an absence of malice on its part. Although an award of mental anguish damages is justified by the evidence presented by Ellinghouse on the issue of malice, the amount of the award substantially exceeds that which the evidence could sustain and therefore must be reduced.

Punitive damages are an extraordinary remedy, outside of the field of usual redressful remedies, and should be applied with caution, lest gendered by passion and prejudice because of the defendant's wrongdoing, the award becomes unrealistic or unreasonable. Such damages may be awarded where the nature of the wrong complained of and the injury inflicted goes beyond merely violating the rights of another and is found to be willful and malicious. This Court consistently has emphasized the primary purpose for assessing punitive damages is to punish the wrongdoer and through that

punishment to deter further unlawful conduct of the tortfeasor and others.

> To perform its office as a deterrent, punitive damages when awarded should be of such significant amount as to serve the office of deterrence by punishing the defendant and as well warn others.

Gibson, supra, 682 P.2d at 740, 41 St.Rep. at 1063.

Appellate courts in most jurisdictions, including ours, will ordinarily defer to the discretion of the fact finder when reviewing the amount of punitive damage award. However, where it appears that such an award has resulted from passion or prejudice, rather than from the reason and justice, the Court must not permit such an award to stand. Passion or prejudice may be shown by the excessive amount of punitive damages itself.

Punitive damages cannot be "'in excess of the amount necessary adequately to punish the defendant and serve as an example to it and others.'" Wayte v. Rollins International, Inc. (Cal. 1985), 215 Cal.Rep. 59, 71. A duty to act is imposed on the reviewing court to act "'[w]hen the award, as a matter of law, appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice . . . '" Little v. Stuyvesant Life Ins. Co. (Cal. 1977), 136 Cal.Rep. 653, 663.

In determining the amount of such damages, the fact-finder should consider the following factors: the nature of the alleged misconduct of the defendant, the extent and the effect of the misconduct on the lives of the plaintiff and others, the probability of future reoccurrence of such misconduct, the relationship between the parties, the relative wealth of the defendant, and the facts and circumstances surrounding the misconduct and the amount of

21

the actual damages awarded. These factors are comparable to those set out in an early Montana case, Ramsbacher v. Hohman (1927), 80 Mont. 480, 489, 261 P. 273, 277. However, they are more carefully and more appropriately stated for the kinds of lawsuits being brought in the present day.

The 1985 Legislature enacted a package of amendments to our punitive damages law. The new Montana provisions found at § 27-1-221(2) through (7), MCA, provide the claim for punitive damages must be proved by clear and convincing evidence. The plaintiff must prove a prima facie case for punitive damages to the judge before any evidence regarding defendant's financial affairs may be presented to the jury. In all cases but those where actual fraud or actual malice is shown, the punitive damages are limited to $25,000 or 1% of the defendant's net worth, whichever is greater. In the future these elements must be taken into consideration in awarding punitive damages.

We find the damages awarded so grossly excessive and disproportionate to the injury as to shock one's conscience. As a matter of law, they must have been determined by passion or prejudice. A means of controlling excess punitive damages verdicts is to order a new trial on the issue of damages or, in the alternative, remittitur, with reduction of the amount of a portion of punitive damages awarded to the plaintiff. The evidence in this case is sufficient to sustain a verdict against Safeco, but does not show a vindictiveness or ill will on its part so extreme as to warrant the exorbitant sum awarded here. Nonethess, it violates the standards quoted above, which we believe should guide the trial court in making punitive awards.

Judgment is reversed without costs and a new trial ordered unless the respondent Ellinghouse shall within fifteen days agree in writing to a reduction of the total verdict to the sum of $1,000,000, in which event the judgment is modified accordingly, and as modified, affirmed. In the event the respondent determines not to take the modified judgment, the retrial of the case will be limited to the issue of damages.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Honorable Thomas A. Olson,
Judge of the District Court,
sitting for Mr. Justice L. C.
Gulbrandson.

23

Mr. Justice Frank B. Morrison, Jr., dissenting:

I dissent to the remittitur.

Most of the majority opinion is excellent. However, I am befuddled by the treatment of the damage issue.

The majority opinion carefully notes there is no reversible error on any of the liability questions. Therefore, I assume that a new trial is being ordered on damages only unless respondents accept a reduction in the total verdict to the sum of $1,000,000. This point is not made clear.

Neither is it clear how the majority arrived at the figure of $1,000,000. The opinion carefully notes the egregious conduct of Safeco which is the one thing in this case that in fact shocks one's conscience. We recently affirmed a verdict, in a far less egregious case. Flanigan v. Prudential Federal Savings and Loan (Mont. 1986), 720 P.2d 257, 43 St.Rep. 942. Flanigan was a wrongful termination case where the jury returned a verdict in favor of plaintiff. She was awarded $94,170 in economic damages, $100,000 for emotional distress, and punitive damages in the amount of $1,300,000. In other words, the Flanigan case involved $194,170 in compensatory damage whereas this case involves an award of $225,000 in compensatory damages. In Flanigan we upheld punitive damages in the amount of $1,300,000. In this case we are reducing punitive damages to $775,000, some $525,000 less than we allowed in Flanigan.

Without any question the conduct of Safeco in this case is more outrageous than the conduct of Prudential Federal Savings and Loan in the Flanigan case. Furthermore, the undisputed evidence is that, in 1983, the Safeco group had amassed assets of $3,414,715,000. Revenues were $1,702,159,000 for one year. Shareholders equity (net

24

assets) was over $1,000,000,000. The jury verdict of $5,000,000 in punitive damages in this case is ½ of 1% of the defendant's net worth.

The net worth of Prudential Federal Savings and Loan in the Flanigan case was $44,000,000. The 1.3 million dollar verdict is nearly 3% of Prudential's net worth.

Since the purpose of punitive damages is to deter wrongful conduct and punish the tortfeasor the punitive damage award should bear some relationship to the net worth of the defendant. How the majority upholds 1.3 million dollars against a relatively small company, Prudential Savings and Loan, and reduces to $775,000 a punitive damage award against one of America's large corporations, I do no understand.

When appellate judges attempt to circumvent the jury process and substitute their judgment for those who hear the evidence, they inevitably err. Up to this time there is little, if any, precedent supporting the Montana Supreme Court substituting its judgment for that of the jury. Unfortunately that strong support for the jury system has now been dynamited. The majority announces loud and clear that from this day forward, four justices, robed in judicial onmiscience, will replace our jury. It is a sad day indeed.

Justice

Mr. Justice William E. Hunt, Sr.:

I concur with the dissent of Mr. Justice Frank B. Morrison, Jr.

Justice

25

Mr. Justice John C. Sheehy, dissenting:

I concur with the dissent of Mr. Justice Morrison and add these comments.

This is the worst case of judicial interference by this Court with a jury verdict since the notorious O'Brien cases (O'Brien v. Great Northern Railway Company (1953), 145 Mont. 13, 400 P.2d 634; O'Brien v. Great Northern Railway Company (1966), 148 Mont. 429, 421 P.2d 710, cert. den. 387 U.S. 920). It is the worst case of judicial aberration since the infamous Ashcraft case (Ashcraft v. Montana Power Company (1971), 156 Mont. 368, 480 P.2d 812). The O'Brien cases convinced the plaintiffs' bar in Montana that there was no judicial restraint in the make-up of this Court in the 1960s. The Ashcraft ruling was corrected and overruled by the members of the Constitutional Convention of 1972 through the adoption of Art. II, § 16 of the Montana Constitution. The deleterious effect of the opinion in this case is its announcement that the right of a jury to set damages is hereafter subject to the consent of the majority of this Court.

The right to jury trial and the right of parties to have a jury determine the cause is limited to one jury of no less than six persons and no more than twelve. There is no lawful provision for a second super jury, composed of four majority members of this Court. The first jury at least was sworn in. The second and unsworn jury, in conference and by memoranda, debated on what they might agree, ranging from reversal to $200,000 to $2,500,000. Their conclusion was reached in a conference telephone conversation by the majority without the minority members of the Court, who were not invited and did

- 26 -

not participate. Of course, the minority members would not have participated in any event, since they did not agree with the decision. But this was the first occasion in my eight years on the court that the decision of a divided court was reached ex-conference. The resultant figure in the majority opinion has no relation to the evidence, and no explanation is offered nor can be offered by the majority for the figure adopted.

Worse, the majority do not point to a single error made by the District Court in the conduct of the trial. Only the jury is blamed, accused of passion and prejudice. Ignored is the qualitative element of outrage of the jurors that must inhere in punitive damages awards: the jury must be convinced that the defendant was so motivated by malice, fraud and oppression in its treatment of the plaintiff that, in addition to punishment, to deter others an award must be made in an amount sufficient to set an example. It is not idly that punitive damages are referred to in the codes as exemplary damages.

Would that the majority, whose consciences are shocked by the jury, were more shocked by the flagrant abuse heaped upon the plaintiff and other insureds by this insurance company. For 25 years under the evidence here, the last instance a week before the trial of this case, this insurance company persisted as a business practice in misleading its insureds into signing agreements which waived their legal rights and claims against the company, through deception and fraud. Then the company denied the claims. This insured, after signing such an agreement, and getting such a denial, was forced to mortgage his home to settle a claim which rightfully should have been settled by the insurance company

as the evidence shows. That plaintiff suffered emotional distress is beyond cavil. Yet the majority here have wiped out, without comment, his jury-given award for emotional distress.

When the courts cannot be relied on to enforce jury awards against outrageous conduct, and awards are reversed on the grounds of passion and prejudice, the jury members are demeaned by an implication, nay, accusation of unfairness. In my view, this jury acted responsibly toward an irresponsible defendant. It did not act unfairly. It should be supported, not demeaned.

_John C. Sheehy_
_____
Justice