No. 92-013

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

PORTAL PIPE LINE COMPANY,

Plaintiff and Appellant,

v.

STONEWALL INSURANCE COMPANY, UNITED
STATES FIRE INSURANCE COMPANY, AMERICAN
CENTENNIAL INSURANCE COMPANY and FIRST
STATE INSURANCE COMPANY,

Defendants and Respondents.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone,
               The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Bruce R. Toole, Lawrence B. Cozzens,
            Jon T. Dyre, Crowley, Haughey, Hanson,
            Toole & Dietrich, Billings, Montana

        For Respondent:

            L. Randall Bishop, Jarussi & Bishop,
            Billings, Montana (First State)

FILED

Filed:    JAN 1 4 1993

    Ed Smith
CLERK OF SUPREME COURT
   STATE OF MONTANA

Submitted on Briefs:  July 30, 1992

Decided:  January 14, 1993

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellant Portal Pipe Line Company appeals from an order of the Montana Thirteenth Judicial District Court, Yellowstone County, granting respondent First State Insurance Company's cross-motion for summary judgment pursuant to Rule 56, M.R.Civ.P.

We affirm.

Portal presents five issues for this Court to consider:

1. Did the District Court err in determining that Ashland's negligence claims did not constitute an "occurrence" as defined by First State's policy?

2. Did the District Court err in allowing First State to rely on exclusions without reserving the right to do so prior to the time the Ashland litigation was settled?

3. Did the District Court err in determining that the "product" exclusions language excluded coverage for Ashland's oil damage claims?

4. Did the District Court err in determining that the "operations performed" exclusion language excluded coverage for Ashland's oil damage claims?

5. Did the District Court err in determining that the "level of performance" exclusion language excluded coverage for Ashland's loss of use claims?

The complexity of this case requires that we provide a backdrop before discussing the relevant facts to the present case. Portal Pipe Line Company (Portal) operates a crude oil pipeline running from Reserve, Montana, east through North Dakota and into

2

Minnesota. In 1984, Portal was sued by Ashland Oil Company (Ashland) which had contracted for the purchase of crude oil to be transported to its refinery at St. Paul, Minnesota, through Portal's pipeline. In 1984, Ashland claimed that Portal earned enormous profit by permitting certain shippers to inject an extremely volatile high vapor pressure butane-gas (B-G mix) for blending by Portal into its common stream of crude oil. This was allegedly done in violation of the Portal tariff, a contract which strictly governs the handling and operation of the crude oil pipeline.

As a result of B-G mix injections, Ashland claimed that it lost money each month from March 1980 through February 1984. On March 1, 1984, Portal prohibited further injections of the highly volatile butane-gas into the crude pipeline. Ashland's litigation was settled on December 21, 1988.

In the present action before this Court, Portal sued its excess insurers seeking to recover the dollars it spent settling Ashland's claims for punitive and compensatory damages. Originally, the respondents consisted of four insurance companies providing insurance to Portal from September 30, 1979, to September 30, 1984. During each of those five years, United States Fidelity and Guaranty Company (USF&G) provided primary insurance coverage of $500,000. The four respondents named in this action were excess insurers, each providing $10,000,000 of insurance coverage over and above the $500,000 of USF&G's primary coverage.

3

Portal's complaint alleged six separate counts seeking declaratory judgment, breach of contract, and several tort claims. On March 29, 1990, the court ordered the tort claims bifurcated upon stipulation of all the parties.

On January 25, 1991, the court granted summary judgment in favor of respondent Stonewall Insurance Company on the declaratory judgment and breach of contract claims. Portal dismissed with prejudice all claims against respondents American Centennial Insurance Company and United States Fire Insurance Company. Portal then filed a motion for partial summary judgment requesting the District Court declare, as a matter of law, that at least some coverage must exist under the First State insurance contract. First State filed a cross-motion arguing that the undisputed material facts established and absence of coverage. On August 29, 1991, the District Court issued its memorandum and order granting partial summary judgment to First State on the claims for declaratory judgment and breach of contract. On October 29, 1991, the court issued its order dismissing all remaining counts of Portal's tort claims based upon Portal's original dismissal against the other respondents. It is from these two orders that Portal appeals.

I.

Did the District Court err in determining that Ashland's negligence claims did not constitute an "occurrence" as defined by First State's policy?

4

In order for summary judgment to be properly granted, the moving party must demonstrate that there is no genuine issue of material fact in light of the substantive principles that entitle the party to summary judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Richland National Bank & Trust v. Swenson (1991), 249 Mont. 410, 816 P.2d 1045. If the moving party meets this burden, then the burden shifts to the nonmoving party to demonstrate a genuine issue of material fact. Swenson, 816 P.2d at 1050. "'Mere denial or speculation will not suffice, the non-moving party must show facts sufficient to raise a genuine issue.'" Swenson, 816 P.2d at 1050 (quoting Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 117, 760 P.2d 57, 60). All reasonable inferences that may be drawn from the offered proof are to be drawn in favor of the party opposing the summary judgment. Cereck v. Albertson's, Inc. (1981), 195 Mont. 409, 411, 637 P.2d 509, 511.

With these principles in mind, we will discuss the following issues:

First State's insurance policy provided coverage for property damage which was caused by an "occurrence." The relevant portion of First State's insurance agreement states the following:

> To indemnify the INSURED for ULTIMATE NET LOSS . . . all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:
>
> . . . .
>
> B. PROPERTY DAMAGE, as hereinafter defined:
>
> . . . .

5

to which this policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

The policy also defines "occurrence" as:

[A]n accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED.

Portal maintains that the damage caused to Ashland was neither an intended nor expected result of its decision to allow B-G mix into its pipeline in violation of the tariffs. As a result, Portal argues that its negligence claims fall under First State's policy definition of "occurrence."

We have previously defined occurrence policy language in Northwestern National Casualty Company v. Phalen (1979), 182 Mont. 448, 597 P.2d 720. We interpreted the language to mean that:

[I]t precludes coverage for bodily injuries or damages, though not specifically intended by the insured, if the resulting harm was within the expectation or intention of the insured from his standpoint.

Phalen, 597 P.2d at 726.

We explained that the use of the word "occurrence" had a broader definition than the word "accident" and that the intent of the policy is to insure the acts or omissions of the insured, including his intentional acts, excluding only those in which the resulting injury is either expected or intended from the insured's standpoint. Phalen, 597 P.2d at 726.

In New Hampshire Insurance Group v. Strecker (1990), 244 Mont. 478, 798 P.2d 130, we determined the applicability of this exclusion by utilizing a two-pronged test. If either prong of the

6

test is satisfied, the acts at issue will fall within the exclusion provision and are not covered under the policy:

> The first prong is satisfied if the injury was <u>not</u> caused by an accident. The second prong is satisfied if the injury was either expected or intended from the standpoint of the insured.

Strecker, 798 P.2d at 132.

The record reflects, and Portal does not dispute, that Portal intentionally accepted high vapor pressure liquids for transportation through its pipeline. The B-G mix could not have been introduced into the pipeline without Portal's conscious business decision to do so. The tariff prohibited the introduction of a product that would exceed vapor pressure of 13 pounds. Portal interpreted the tariff in a manner which permitted it to ignore the injection point pressure readings. Portal knew, despite its subjective contentions to the contrary, that its actions were expected to cause injury to Ashland's refinery.

Portal relies heavily upon our holding in Lindsay Drilling v. U.S. Fidelity & Guaranty (1984), 208 Mont. 91, 676 P.2d 203, where we held that similar policy language excluded from coverage damage caused by the company or its employees. However, because the complaint raised the possibility that core samples were salted by third parties as a result of Lindsay's negligence, we held that a duty to defend could not be ruled out on summary judgment.

In Lindsay, core samples were taken which were intended to permit accurate evaluation of the precise nature of the mineral content of the land included within the mining claim offered for

7

sale. The accuracy of any assay of the mining core samples depended upon their purity. Plaintiff alleged that the samples were "salted," perhaps by an unknown defendant gaining access through the negligence of Lindsay.

Unlike a mining claim core sample, the material contained within the oil stream is always blended and "materially altered" as new injections from various shippers come on stream. There is no uncertainty, in this case, as to who contaminated the common stream. Therefore, Lindsay is not applicable to this case. We hold that the District Court did not err in determining that Ashland's negligence claims did not constitute an "occurrence" as defined by First State's policy.

## II.

Did the District Court err in allowing First State to rely on exclusions without reserving the right to do so prior to the time the Ashland litigation was settled?

Portal maintains that First State is estopped from asserting certain policy defenses because it did not adequately reserve its rights. First State sent Portal three reservation of rights letters during the pendency of the Ashland litigation. In the letters, First State denied coverage on four grounds: (1) that the policy was not an occurrence which took place within the effective date of the policy; (2) that public policy may prohibit coverage for punitive damages sought by Ashland; (3) that damages claimed by Ashland did not constitute property damages under the policy; and (4) that the policy did not cover any injury or destruction of any

8

oil sold, handled, or distributed by Portal. First State did not advise Portal of any other policy defenses.

It is well established in Montana that an insurer has an obligation to inform the insured of all policy defenses it intends to rely upon. Section 33-18-201(14), MCA, of the Unfair Trade Practices Act provides that an insurer may not:

> [F]ail to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim . . . .

In Safeco Insurance Company v. Ellinghouse (1986), 223 Mont. 239, 725 P.2d 217, we interpreted the above statute, stating:

> Where an insurer, without reservation and with actual or presumed knowledge, assumes the exclusive control of the defense of claims against the insured, it cannot thereafter withdraw and deny liability under the policy on the ground of noncoverage, prejudice to the insured by virtue of the insurer's assumption of the defense being, in this situation, conclusively presumed . . . the loss of the right of the insured to control and manage the case is itself prejudicial.

Ellinghouse, 725 P.2d at 221 (quoting 14 Couch, Insurance 2d, § 51.85 (2d ed. 1982).)

In this instance, First State does not have the conflict of interest present in Ellinghouse. First State did not have a duty to defend Portal, nor did it assume any defense of Portal. Portal obtained independent counsel which represented Portal throughout Ashland's litigation. Although First State did participate in settlement negotiations which were likely to involve First State, this did not constitute an assumption of Portal's defense. Portal was not prejudiced by First State's reliance on the different

9

exclusions. We hold that First State did not waive its policy defenses and is not estopped from asserting those defenses.

III.

Did the District Court err in determining that the "product" exclusions language excluded coverage for Ashland's oil damage claims?

A review of the language under Section B(3) of First State's insurance policy indicates that coverage does not apply:

> [U]nder Coverage I(B) [Property Damage], to injury to or destruction of or loss of . . . (3) any goods, products or containers thereof, manufactured, sold, handled, or distributed, or work completed by or for the INSURED, out of which the OCCURRENCE arises.

Exclusions of this kind are an attempt by the insurance industry to eliminate the "moral hazards" to the insurer. Donald M. Zupanec, Scope of Clause Excluding From Contractor's or Similar Liability Policy Damage to Property in Care, Custody, or Control of Insured, 8 A.L.R. 4th 563 (1981). The purpose of this type of exclusion is intended to eliminate the possibility that an insured will either cut corners or take unreasonable risks in the performance of its insured operations and then shift the loss onto the insurer. With this intent in mind, and applied to the facts of this case, the clause is not ambiguous or unclear.

In Philadelphia Fire & Marine Insurance Company v. City of Grandview (Wash. 1953), 255 P.2d 540, the Washington Supreme Court defined "handled" contained in a similar exclusion clause as:

> To handle or to distribute, within the meaning of the insurance policy, implies a conscious control over

10

and a conscious intent to parcel out whatever is to be distributed.

Grandview, 225 P.2d at 545.

Grandview involved the accidental mixing of gas into the city's water main which caused one house to explode and damaged the next door neighbor's house. The Washington Supreme Court ruled that the city of Grandview did not handle the gas within the contemplation of the insurance agreement because it was not in the business of handling gas but only water. As a result the exclusion did not apply.

The facts of this case are just the opposite. Portal's business involves the controlling of injection and transportation of petroleum products in its common stream. Portal took conscious control over and maintained a conscious intent to "parcel out" crude petroleum, including the B-G mix which it allowed to be intentionally mixed into the common stream.

Portal cites Smedly Company v. Employers Mutual Liability Insurance Company of Wisconsin (Conn. 1956), 123 A.2d 755, which interpreted "handled" in a similar insurance policy exclusion that referred to those commodities which the insured is in the business of buying, selling, dealing, and trading.

This interpretation affords no relief to Portal. Portal was also in the business of selling petroleum products. Portal had its own "allowance oil" which it placed into the common stream and regularly sold to Ashland. Since Portal cannot differentiate its own allowance oil from that of its shippers, the common stream

11

consisted of the same goods and products which Portal regularly traded and dealt. We hold the District Court did not err in determining that the "product" exclusions language excluded coverage for Ashland's oil damage claims.

## IV.

Did the District Court err in determining that the "operations performed" exclusion language excluded coverage for Ashland's oil damage claims?

Endorsement #2 of First State's insurance policy incorporates the Broad Form Endorsement from Portal's USF&G primary insurance policy, together with USF&G's Exclusion A(2)(a). The exclusion modifies the Broad Form Endorsement with the ensuing language:

> This insurance does not apply:
>
> . . . .
>
> (2) . . . .
>
> (a) To property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured.

The same exclusionary language existed in Topeka Railway Equipment, Inc. v. Foremost Insurance Company (Kan. 1980), 614 P.2d 461. In that case, the insured, Topeka Railway, was in the business of repairing and remodeling railroad cars. A number of railway cars were delivered to Topeka at a United States Air Force base. Two of the cars were damaged when one of the insured's cars came loose and rolled down the tracks, causing a collision. The insured was nothing more than a permissive user of the tracks. In

12

rejecting the application of the language, the Kansas Court ruled that:

> The (y)(2)(a) exclusion was rejected on the basis that the accident did not occur on the premises owned by or rented to the insured.

Topeka Railway, 614 P.2d at 463.

In this instance, the facts are just the opposite. We conclude that Portal's pipeline constituted "premises owned by . . . the insured."

Portal, however, contends that the word "operations" is undefined in First State's policy which makes the exclusion clause ambiguous and should be strictly construed against First State. We acknowledge that the term "operations" is not defined in the insurance agreement. Therefore, we must look to the plain and ordinary meaning of the word.

Webster's defines "operation" as "performance of a practical work or of something involving the practical application of principles or processes." Webster's New Collegiate Dictionary 797-98 (1973). The evidence reflects that all of the crude petroleum which comprised the common stream was delivered to Portal so that it could be injected into the pipeline, blended into the common stream, and then pumped to Minnesota through the application of pressure from Portal's compressors and booster stations along the way. We adopt the reasoning of the District Court that if the common stream was at first "clean" or "bargained for" then it became contaminated or "unbargained for" when, while making its way through the pipeline, Portal watered it down with B-G mix. The

13

property was damaged while Portal performed pipeline operations upon it while it was on the premises of Portal for precisely that purpose. We hold that the District Court did not err in determining that the "operations performed" exclusion language excluded coverage for Ashland's oil damage claims.

V.

Did the District Court err in determining that the "level of performance" exclusion language excluded coverage for Ashland's loss of use claims?

Portal asserts that the "level of performance" exclusion does not apply to Ashland's oil claims. First State's insurance policy Exclusion C provides that coverage would not apply under the resulting conditions:

[T]o loss of use of tangible property which has not been physically injured or destroyed, resulting from:

(1) a delay in or lack of performance by or on behalf of the INSURED of any contract or agreement or

(2) the failure of the INSURED'S products or work performed by or on behalf of the INSURED to meet the <u>level of performance, quality, fitness</u> or durability warranted or represented by the INSURED: but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the INSURED'S products or work performed by or on behalf of the INSURED after such products or work performed by or on behalf of the INSURED have been put to use by any person or organization other than the INSURED. [Emphasis added.]

Portal's tariff with Ashland is a contract of carriage under the Interstate Commerce Act. The tariff mandated that petroleum products exceeding 13 pounds of vapor pressure were not to be

14

transported in the pipeline. If something is injected into the pipeline which would exceed 13 pounds, then the product received by Ashland was considered contaminated and deprived Ashland the benefit of its bargain. In its lawsuit, Ashland contended that Portal's common stream did not meet the specifications of the tariff and that such nonconformance caused extensive damage. We agree with the District Court that the tariff was a contract of carriage which expressly warranted and represented that the "products or work performed" by Portal in creating and transporting its common stream of crude petroleum would attain a certain defined level of "quality" or "fitness." We hold that the District Court did not err in determining that the "level of performance" exclusion language excluded coverage for Ashland's loss of use claims. We hold that the granting of summary judgment in favor of First State was proper.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15

January 14, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Bruce R. Toole; Lawrence B. Cozzens; Jon T. Dyre
Crowley, Haughey, Hanson, Toole & Dietrich
P.O. Box 2529
Billings, MT  59103


L. Randall Bishop
Jarussi & Bishop
P.O. Box 3353
Billings, MT  59103

Patrick Watt
JARDINE, STEPHENSON, BLEWETT & WEAVER
P.O. Box 2269
Great Falls, MT  59401


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
   Deputy