**AMERICAN SIMMENTAL ASSOCI-ATION, a Montana Non–Profit Association, Plaintiff,**

v.

**COREGIS INSURANCE COMPANY, an Indiana Corporation, Defendant/Third Party Plaintiff,**

v.

**St. Paul Fire & Marine Insurance Company, a Minnesota Corporation, Defendant/Third Party Defendant.**

**No. 4:98CV3327.**

United States District Court, D. Nebraska.

Nov. 23, 1999.

R. Murray Ogborn, Vollis E. Summerlin, Jr., Krista L. Kester, Ogborn, Summerlin Law Firm, Lincoln, NE, for Plaintiff's Counsel.

William R. Johnson, Lamson, Dugan Law Firm, Omaha, NE, Jeffrey A. Goldwater, Robert S. Marshall, Bollinger, Ruberry Law Firm, Chicago, IL, for Defendant/Third Party Plaintiff's Counsel.

P. Shawn McCann, Sodoro, Daly Law Firm, Omaha, NE, Rebecca R. Haller, Vineet Gosain, Oppenheimer, Wolff Law Firm, Chicago, IL, for Defendant/Third Party Defendant's Counsel.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This diversity case is before the court on cross motions for summary judgment. It presents an insurance coverage issue. The American Simmental Association (ASA) was sued by third parties in what became known as the "Blue Dane Litigation." ASA tendered the defense of that litigation to, and requested indemnity from, Coregis Insurance Company (Coregis) and St. Paul Fire & Marine Insurance Company (St. Paul). Although it had no duty to provide a defense because of the terms of its policy, Coregis admitted that it was responsible for some or all of the defense costs incurred by ASA. In contrast, St. Paul asserted that it had no responsibility to provide a defense or to pay ASA's defense costs.

Both ASA and Coregis have filed motions for summary judgment against St. Paul arguing that St. Paul had a duty to defend and a responsibility to pay some or all ASA's defense costs. St. Paul has filed a summary judgment motion arguing that it has no such responsibility. (ASA also filed a motion for summary judgment against Coregis (filing 48) but did not brief it. That unbriefed motion is deemed abandoned under NELR 7.1(a)(1).)

In general, I will grant the motions for summary judgment submitted by ASA and Coregis. I deny St. Paul's motion.

## I. UNDISPUTED FACTS

St. Paul issued a comprehensive general liability policy to the ASA, which provides coverage for "advertising injury" caused by the advertising offenses of "unauthorized taking of advertising ideas or style of doing business" and "infringement of copyright, title or slogan." The plaintiffs in the Blue Dane Litigation, owners of "fullblood" Simmental cattle, filed suit against the ASA alleging that the ASA falsely advertised the status of "Risinger cattle" as "fullblooded" Simmental cattle, causing plaintiffs to lose customers and sales and

damaging their reputations as Simmental breeders. In disposing of this case by summary judgment, this court must address the following issue:

> Did St. Paul breach its duty to defend the ASA by its refusal to defend the ASA under its advertising injury coverage against claims brought against the ASA for false advertising covering the "fullblood" designation applied to the "Risinger cattle?"

## A. The St. Paul Policies

St. Paul issued three General Commercial Property and Liability Policies to the ASA.[1] The first policy was issued for the policy period October 1, 1991, to October 1, 1992. St. Paul then issued two renewal policies for the policy period October 1, 1992, to October 1, 1993, and October 1, 1993, to October 1, 1994. (Ex. E.[2]) The St. Paul policies provide liability insurance to the ASA and its officers, directors and employees for covered acts or omissions done within the course and scope of the ASA's activities.

The Insuring Agreement for the October 1, 1991, to October 1, 1992, St. Paul Policy provides the following coverage for advertising injury liability:

> **Personal injury and advertising injury liability.** We'll pay amounts any protected person is legally required to pay as damages for covered personal injury or advertising injury that's caused by an offense committed while this agreement is in effect.

The St. Paul Policy specifically defines the term "Advertising injury" as follows:

> **Advertising injury** means injury caused by any of the following offenses that result from the advertising of your products or work:
>
> • Libel or slander;

• written or spoken material made public which belittles the products or work of others;

> • written or spoken material made public which violates an individual's right of privacy;
>
> • unauthorized taking of advertising ideas or style of doing business;
>
> • infringement of copyright, title or slogan.[3]

The St. Paul policy contains a duty to defend clause, which reads in pertinent part, as follows:

> **Right and duty to defend:** We'll have the right and duty to defend any claim or suit for covered injury or damage made or brought against any protected person.

(Ex. E.)

## B. The Coregis Policy

Coregis issued a claims-made and reported Non–Profit Organization Liability Insurance Policy to the ASA, with effective dates of January 16, 1994, to January 16, 1995. (Ex. L.) The Coregis policy is an indemnity policy, which does not contain a duty to defend the ASA. The Coregis policy contains an "Other Insurance" provision, which states that the Coregis policy applies in excess of other insurance.

## C. The ASA and Simmental Cattle

The ASA is a not-for-profit association that registers and promotes the designation of the Simmental breed of cattle. (Ex. A ¶¶ 10, 18.) Originally, the ASA designated Simmental cattle in one of four categories: (1) "purebred;" (2) seven eighths; (3) three quarters; or (4) half breeds. (*Id.* ¶ 18.) Through common usage, the "purebred" designation was equated with "fullblooded." The "purebred" designation required a high percentage of Simmental breed in the cattle's genetics.

---

1. The parties have not pointed out any material differences in the policies.

2. The exhibits cited in this opinion are found at filing 69.

3. The policies do not define the words used to describe "unauthorized taking" or "infringement."

In 1988, the ASA members passed a rule to include a classification for cattle with "foreign ancestry." (*Id.* ¶ 16.) Under the 1988 rule, the "foreign ancestry" designation applied to Simmental animals that originated from one of four European countries: Germany, Switzerland, France or Austria. (*Id.* ¶ 16.) The 1988 rule did not consider the genetic purity of the "foreign ancestry" cattle. (*Id.*)

In 1991, Tom Risinger ("Risinger"), a board member of the ASA, allegedly began efforts to import European bulls to the United States. (*Id.* ¶¶ 7, 21, 22.) In late 1991, Risinger attempted to register the German bulls, "Westoner" and "Washington" ("Risinger cattle") as "fullblood" Simmentals with the Canadian Simmental Association (the "CSA"). (*Id.* ¶ 24.) The CSA allegedly informed Risinger that neither of the Risinger cattle were eligible for "fullblood" designation because the cattle had Angus genetics in their background. (*Id.* ¶ 24.)

Thereafter, Risinger submitted registration applications to the ASA for the Risinger cattle. The ASA registered the Risinger cattle as "fullblood." (*Id.* ¶ 30.)

In 1991, the ASA amended its by-laws to replace the title "foreign ancestry" with "fullblood." (*Id.* ¶ 17.) Under the amendment, the "foreign ancestry" Simmental cattle were given the designation of "fullblood," based solely on whether the animals originated from any one of the four qualifying European countries. (*Id.*)

In February, 1994, the ASA membership, through a series of rule changes, formally adopted the revised "fullblood" designation for cattle with the requisite proven foreign ancestry. (*Id.* ¶ 29.) By virtue of the adoption, there was no longer an exclusive requirement that the "fullblood" cattle contain a certain percentage of Simmental genetics. (*Id.* ¶ 18.) In short, the designation "fullblood" was a unique term of art.

### D. The Underlying Action

On April 14, 1994, Blue Dane Simmental Corporation, Roland Nuss, Ronald Vlasin, and Dennis Behrhorst (the "underlying plaintiffs") filed a two-count complaint against the ASA, Tom Risinger and John Doe in the United States District Court for the District of Nebraska, styled *Blue Dane Simmental Corporation et al. v. American Simmental Association et al.*, Case No. CV 94–3116 (U.S.D.C.Neb.) (the "Blue Dane Litigation"). (Ex. A.) The complaint in the Blue Dane Litigation alleged that the ASA improperly designated the Risinger cattle as "fullblood" Simmentals in violation of RICO and the antitrust laws. (*Id.*)

Specifically, the complaint in the Blue Dane Litigation alleged that the underlying plaintiffs were members of the ASA and Simmental breeders. (*Id.* ¶¶ 2, 3, 4.) They claimed that the ASA was the only entity of its kind in the United States. (*Id.* ¶ 10.) Under the ASA by-laws, the underlying plaintiffs allegedly had rights and interests with respect to the ASA and its property. (*Id.* ¶ 15.) In 1991, the ASA allegedly amended its bylaws to provide the designation of "fullblood" to Simmentals. (*Id.* ¶ 17.) On April 15, 1992, the ASA registered the Risinger cattle as "fullbloods." (*Id.* ¶ 30.) The defendants allegedly designated the Risinger cattle as "fullbloods," despite the defendants' alleged knowledge that the animals were not "fullbloods." (*Id.* ¶ 37.) The ASA allegedly began "marketing" the cattle as "fullbloods." (*Id.* ¶ 39.)

In August, 1992, Risinger and the ASA allegedly published advertisements in the Register (the official publication of the ASA), indicating that the Risinger cattle were 100 percent Fleckvieh Simmental genetics. (*Id.* ¶ 41.) The underlying plaintiffs alleged that the representations made by defendants in that advertisement were false. (*Id.* ¶ 41.) The underlying plaintiffs alleged that defendants' representation of the Risinger cattle as "fullbloods" caused the value of their animals to diminish by at least 50 percent. (*Id.* ¶ 51.)

On or about April 18, 1994, the ASA tendered its defense in the Blue Dane Litigation to St. Paul, including a copy of

the Blue Dane Litigation Complaint. (Ex. F.) By letter dated May 5, 1994, St. Paul informed the ASA that it refused to defend the ASA for the Blue Dane Litigation. (Ex. G.)

Subsequently, the underlying plaintiffs filed an Amended Complaint (Ex. B), and a Second Amended Complaint against the ASA, adding claims under the Lanham Act (Count III) and for Negligence (Count IV) against defendants. (Ex. C.) The Second Amended Complaint in the Blue Dane Litigation contained new claims that the ASA's alleged labeling and advertising of the Risinger animals as "fullblooded" constituted false advertising under the Lanham Act and that the ASA and its directors negligently drafted a rule, which allowed the inaccurate registration of the Risinger animals as "fullbloods." (*Id.*)

Specifically, the Second Amended Complaint alleged that at the time the defendants designated the animals with the title of "fullbloods," the defendants began the "advertisement," "promotion," and "representation" of the Risinger cattle as "fullbloods." (*Id.* ¶ 70.) The underlying plaintiffs alleged that the ASA's statements as to the designation and title of the Risinger cattle were false because the Risinger cattle contained Angus genetics. (*Id.* ¶ 71.) The underlying plaintiffs alleged that the ASA's false advertising and promotion was disseminated to purchasers of Simmental genetics and Simmental breeders, who were actually deceived or tended to be deceived by the false advertising and promotion. (*Id.* ¶ 72.) The underlying plaintiffs further alleged that the ASA's misrepresentation was likely to influence the purchasing decisions of those to whom the false advertising and promotion was disseminated. (*Id.* ¶ 73.) The underlying plaintiffs alleged that defendants' misrepresentation injured the underlying plaintiffs by causing them to lose customers and sales, resulting in business losses and impairment of the underlying plaintiffs' ability to compete. (*Id.* ¶ 75.) In addition, the underlying plaintiffs alleged that defendants' misrepresentations, advertisements, and promotions would likely cause the underlying plaintiffs irreparable harm by damaging their reputation as Simmental breeders, as well as the reputation of their Simmental genetics. (*Id.* ¶ 76.)

By letter dated April 4, 1996, the ASA tendered the Second Amended Complaint to St. Paul, including with the letter a copy of the Second Amended Complaint. (Ex. H.) By letter dated August 28, 1996, St. Paul denied coverage to the ASA, based partially on the ground that the Blue Dane Complaint did not allege damages for injuries caused by any of the "advertising injury" offenses found in the St. Paul policy. (Ex. I.)

On May 31, 1997, the underlying plaintiffs filed a Third Amended Complaint. (Ex. D.) The Third Amended Complaint contained the same causes of action as those found in the Second Amended Complaint.

On June 26, 1997, the ASA tendered the Third Amended Complaint to St. Paul. (Ex. J.) By letter dated October 13, 1997, St. Paul denied coverage for the same reasons presented in its previous denial. (Ex. K.)

Thereafter, the ASA also tendered the Blue Dane Litigation to Coregis. (Ex. O.) Under the Coregis policy, Coregis agreed to indemnify the ASA for attorneys fees, but explained that Coregis had no obligation to defend the Insured. (Ex. L.)

In January, 1998, the Blue Dane Litigation case was tried. On February 4, 1998, the District Court entered a directed verdict in favor of the ASA on all the causes of action against the ASA in the Blue Dane Litigation. The Eighth Circuit Court of Appeals subsequently affirmed the District Court's decision.

### E. The ASA's Complaint Against Coregis for Reimbursement of Fees and Costs

On or about October 20, 1998, the ASA served Coregis with a complaint in the instant case, seeking to recover the remainder of fees and costs allegedly in-

curred by the ASA in the defense of the Blue Dane Litigation. (Ex. M.)

During the pendency of the Blue Dane Litigation, Coregis had reimbursed the ASA for attorneys fees and costs in the amount of $509,830.73. Coregis has further agreed to pay the ASA an additional $300,000 for reimbursement of defense costs incurred by the ASA in the Blue Dane Litigation.

### F. Coregis' Third Party Complaint Against St. Paul for Contribution, Indemnification and Subrogation

On December 21, 1998, Coregis filed a Third Party Complaint against St. Paul seeking a declaration that St. Paul had a duty to defend the ASA in the Blue Dane Litigation. (Ex. N.) Coregis' Third Party Complaint further seeks contribution and indemnity from St. Paul for the full amount Coregis has paid the ASA for damages or costs incurred in the defense of the Blue Dane Litigation because St. Paul was obligated to act as primary insurer and cover the ASA's attorneys fees and costs, which Coregis was forced to pay due to St. Paul's wrongful denial of coverage. (Ex. N.)

### II. ANALYSIS

St. Paul had a duty to defend ASA if the Blue Dane Litigation implicated a covered risk. This duty to defend was broad and unambiguous:

> **Right and Duty to defend:** We'll have the right and duty to defend any claim or suit for covered injury or damage made or brought against any protected person.

(Ex. E.)

With this duty to defend as a starting point, I next state the law that is applicable to this case. Then I apply that law to the undisputed facts.

### A. Montana Law

Although this case was filed in a Nebraska federal court based upon diversity of citizenship jurisdiction, the parties agree that Montana law applies to the insurance coverage issue. Since ASA was a Montana corporation, since the issuance of the insurance policies took place in Montana, and since Nebraska has no public policies that would be harmed by applying Montana law, I agree that Montana law applies. *See, e.g., Enron Corp. v. Lawyers Title Ins. Corp.,* 940 F.2d 307, 310–13 (8th Cir.1991) (in an action brought, in federal court in Nebraska, against insurance company for failure to defend, Nebraska law would apply to punitive damage claim but Virgin Island law would apply to all other issues; in a diversity case, federal district court must apply the choice of law rules of the forum state; Nebraska, the forum state, has adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws (1971)).

Under Montana law, "the duty to defend arises if a complaint against an insured alleges facts, which if proven, would result in coverage." *Grindheim v. Safeco Ins. Co.,* 908 F.Supp. 794, 800 (D.Mont.1995) (holding that the interpretation of the language of an insurance policy is for the court in the first instance; granting partial summary judgment to insured on claim that insurance company breached a duty to defend; applying Montana law) (citing *Stillwater Condominium Ass'n. v. American Home Assur. Co.,* 508 F.Supp. 1075, 1077 (D.Mont.1981), *aff'd,* 688 F.2d 848 (9th Cir.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983)). When an insurance company receives the tender of the defense of a suit, it is obligated to interpret the complaint to decide whether it has an obligation to defend. *Id.* at 801 (citing *Portal Pipe Line Co. v. Stonewall Ins.,* 256 Mont. 211, 845 P.2d 746, 749 (1993)) (in turn citing *Northwestern Nat'l Cas. Co. v. Phalen,* 182 Mont. 448, 597 P.2d 720, 726 (1979)). The duty to defend is an obligation which "precludes [the insurance company] from interpreting the factual assertions narrowly, and mandates [the insurance company] to construe the factual assertions from the perspective of the insured." *Id.* at 801. "The duty to defend with respect to a particular complaint is 'triggered' regard-

less of the fact that only a portion of the complaint alleges facts, which if proven, would result in coverage." *Id.* at 802 n. 10 (citing *Home Ins. Co. v. Pinski Bros.*, 160 Mont. 219, 500 P.2d 945, 949–50 (1972)).

When reading the words of an insurance policy to decide whether the duty to defend is implicated, three rules of construction are especially important under Montana law. First, "absent an ambiguity, the language of an insurance contract governs its interpretation." *Id.* at 800 (citing *Schell v. Peters*, 147 Mont. 21, 410 P.2d 152, 155 (1966)). Next, "the terms are to be interpreted according to what a 'reasonable person in the position of the insured would understand them to mean.'" *Id.* at 800 n. 6 (citing *St. Paul Fire & Marine Ins. Co. v. Thompson*, 150 Mont. 182, 433 P.2d 795 (1967)). Finally, "'exclusions and words of limitation in a policy must be strictly construed against the insurer regardless of whether or not they are ambiguous.'" *Id.* (citing *Aetna Ins. Co. v. Cameron*, 194 Mont. 219, 633 P.2d 1212, 1214 (1981)).

## B. Application of Montana Law to the Facts

The parties agree that the duty to defend, if implicated at all by the Blue Dane Litigation, arose from the "advertising injury" coverage. The policy provisions regarding that risk read as follows:

> **Advertising injury** means injury caused by any of the following offenses that result from the advertising of your products or work:
> - Libel or slander;
> - written or spoken material made public which belittles the products or work of others;
> - written or spoken material made public which violates an individual's right of privacy;
> - unauthorized taking of advertising ideas or style of doing business;
> - infringement of copyright, title or slogan.

(Ex. E.)

The parties also agree that the duty to defend arises, if at all, from either or both the "unauthorized taking of advertising ideas or style of doing business" language or the "infringement of copyright, title or slogan" proviso. None of the other provisions are applicable.

### 1. ASA's "Product or Works"

As a threshold matter, St. Paul directs me to the introductory language of the "advertising injury" coverage which states that: "**Advertising injury** means injury caused by any of the following offenses that result from the advertising of *your products or work*." (Emphasis added.) According to St. Paul, before "advertising injury" may be found, the complaint must be "centered around the insured's conduct with respect to its own product.... In other words, [coverage did not exist because] it was Risinger's bulls that were being advertised, *not* ASA's services." (St. Paul Fire and Marine Ins. Co.'s Resp. to Coregis' Mot. for Summ. J. at 6–7.)

Since the Blue Dane plaintiffs attacked advertisements directly attributed to ASA regarding the designation "fullblood," which designation was a "product or work" of ASA, I disagree with St. Paul.[4] The business of ASA, as alleged in the Blue Dane Litigation, was the designation of cattle as having a certain quality as defined by specific policies set by ASA. The "product" or "work" of ASA's business was a quality designation, like "fullblood."

The Blue Dane plaintiffs asserted that: "The ASA has as its primary objectives the development, registration and promotion of the simmental breed of cattle in the United States" and it was the "duty of the association to furnish proper certifi-

---

**4.** While the "fullblood" designation was a "product or work" of the ASA, breeders and ASA members, like the Blue Dane plaintiffs, also had special rights to the "product or work" of ASA. (*See, e.g.* Ex. D ¶ 16 (quoting bylaws of ASA relating to the rights of members with respect to the property of ASA).)

cates ...."(Ex. D ¶ 15.) According to the complaint, "ASA and Risinger registered [cattle] as fullblood simmentals and issued registration certificates." (*Id.* at ¶ 54.)

Thus, if it was claimed that the designation "fullblood" was advertised by (or with the approval of) ASA, then ASA's "products or work" were implicated. That was unmistakably the situation here.

The Blue Dane plaintiffs explicitly asserted that: "On or about April 15, 1992, defendants Risinger and *the ASA began the advertisement ... of [the Risinger animals] as fullbloods.*" (*Id.* at ¶ 86 (emphasis added).) They asserted that such advertisements were placed in "[t]he Register" which "is the official publication of the ASA." (*Id.* at ¶ 59.) They also asserted that ASA required that all advertisements regarding the "pedigree" of animals "conform to records kept by the [ASA]." (*Id.* ¶ 58.)

In sum, the Blue Dane allegations implicated ASA's product or work (the label "fullblood") and these allegations asserted that ASA caused the "fullblood" advertising. The question then becomes whether the "advertising injury" claimed by the Blue Dane plaintiffs arose from the "unauthorized taking of advertising ideas or style of doing business" or "infringement of copyright, title or slogan." I turn to those questions next.

### 2. "Unauthorized Taking of Advertising Ideas or Style of Doing Business" or "Infringement of Copyright, Title or Slogan"

While the parties argue about other cases in the context of the "unauthorized taking" element and the "infringement" proviso, I do not find those cases particularly helpful. They are based upon factual circumstances that are not comparable.

Moreover, those cases would not be dispositive even if they were analogous. They are not Montana cases, and the Montana courts have not decided a case similar to this one.

■ Nevertheless, the absence of case-dispositive Montana precedent is relatively unimportant here. A plain and non-technical reading of the Blue Dane pleadings and a similar review of the language from the St. Paul policy [5], coupled with an appreciation of Montana's rules [6], compels the conclusion that St. Paul had a duty to defend under both facets of the "advertising injury" coverage. Briefly, my reasons for this conclusion are set forth below.

It is a fair characterization of the Blue Dane pleadings to state that they allege the following:

The plaintiffs had a special right to use and advertise the ASA designation "fullblood" because they were members of the ASA and because they were true "fullblood breeders."

The "fullblood" designation, being a term of art under the ASA policies, carried with it unique economic value in the hands of the rightful users. The market attached particular significance to that designation, especially when used in advertisements, because the ASA was the only Simmental breeding association in the United States.

ASA wrongfully bestowed the "fullblood" designation on the Risinger cattle, animals that were not entitled to it. By advertising the improper grant of "fullblood" status to the Risinger cattle in the ASA's magazine and elsewhere, ASA diminished the value of the distinctive label "fullblood" in the hands of the rightful users, the Blue Dane plaintiffs.

---

**5.** Keep in mind that the St. Paul policies provided no definition of the relevant words.

**6.** Once again, those rules are: (1) factual assertions in a complaint should not be construed narrowly; (2) a complaint should be construed from the viewpoint of the insured; (3) a duty to defend exists even if only a portion of the complaint alleges facts, which if proven, would result in coverage; (4) absent an ambiguity, the language of an insurance contract governs its interpretation; (5) insurance policies should be interpreted from the viewpoint of a reasonable insured; (6) policy exclusions should be strictly construed against the insurer.

Thus, it is correct to say that the Blue Dane plaintiffs in effect claimed that the "fullblood" designation was a unique "advertising idea," a "style of doing business," a "title" or "slogan." They also essentially claimed that the designation rightfully belonged to them as members of the ASA and as fullblood breeders. Finally, they basically claimed that ASA, in part through its advertising, usurped (took) or impinged upon (infringed) the fullblood designation in their hands, causing them damage.

Under these circumstances, St. Paul had a duty to defend. Therefore, ASA and Coregis have a right to indemnity under the "advertising injury" provision of the St. Paul policy.

### 3. St. Paul's Arguments

Next, I turn briefly to the arguments raised by St. Paul that warrant a response. Essentially, St. Paul argues that I ought to follow two Pennsylvania cases. Then St. Paul asserts an argument regarding causation. I am not persuaded.

St. Paul relies upon *Sorbee International Ltd. v. Chubb Custom Ins. Co.*, 735 A.2d 712, 714 (Pa.Super.1999) (holding that terms like "fat free" did not qualify as an "advertising idea" because they were not "capable of being identified as having been created by one party and stolen or appropriated by another;" applying Pennsylvania law). First, the facts of *Sorbee* are not comparable to the facts of this case. Here, unlike the words "fat free," the designation "fullblood" was unique. The term was bestowed by ASA, the only American Simmental breeding association, and the "fullblood" designation was a term of art under the ASA policies. Second, and contrary to St. Paul's arguments, the *Sorbee* court made clear that "we do not intend to limit the definition of advertising ideas to material that is under trademark. Trademark is merely indicia or evidence of the existence of an advertising idea." *Id.* at 716 n. 2. Third, if I had to choose between *Sorbee* and other opinions, I find a California federal district court's opinion the more persuasive. *See Atlapac Trading*

*Co. v. American Motorists Ins. Co.*, No. CV97–0781, 1997 U.S. Dist. Lexis 21943 (C.D.Cal. Sept. 23, 1997) (claim that insured, Atlapac, falsely labeled its olive oil products as "pure olive oil" was covered under "misappropriation of advertising ideas and style of doing business" provision of insurance policy; Atlapac was sued by Tama Trading, another olive oil producer, under the Lanham Act; applying California law).

Next, St. Paul relies upon *Applied Bolting Technology Products, Inc. v. United States Fidelity & Guar. Co.*, 942 F.Supp. 1029, 1034 (E.D.Pa.1996) (when insured advertised its product as complying with a third party's testing standard, there would be no coverage under an "advertising injury" provision because the underlying plaintiff did not claim "an ownership interest in or an exclusive right to use" the third party's testing standard; applying Vermont law), *aff'd* 118 F.3d 1574 (3d Cir. 1997) (table). *Applied Bolting* is not analogous either. In that case, the underlying plaintiffs did not claim that the advertising deprived them of something that they owned or controlled. They claimed that the insured wrongly advertised someone else's standard; that is, the underlying plaintiffs did not claim the insured wrongly advertised *their* standard. Here, just the opposite is true. The Blue Dane plaintiffs asserted that they, and not Risinger, were truly entitled to the designation "fullblood" because as members of the ASA, and fullblood breeders, they had special rights to the label. Thus, when the ASA wrongly advertised *their* standard for the Risinger animals, the Blue Dane plaintiffs suffered injury.

As for causation, the Blue Dane pleadings asserted that the "Defendants' misrepresentation in commercial advertising ... was disseminated to the purchasers of Simmental [cattle]" and those persons "were actually deceived or tended to be deceived by" the advertising. (Ex. D.¶ 88.) This conduct "injured plaintiffs by causing plaintiffs [to] lose customers and sales,

resulting in business losses and impairment of plaintiffs' ability to compete." (*Id.* ¶ 90.) As a result, St. Paul's causation argument—the harm was caused by the improper registrations and not the advertisements—is incorrect.

### C. The Other "Fight" Between Coregis and St. Paul

Coregis argues that if the St. Paul had a duty to defend, then, because of the "other insurance" provisions of the polices, St. Paul has the responsibility to pay for *all* the defense costs. St. Paul argues that if it had a duty to defend, it would share in only a portion of those costs, but it does not tell me what its share would be. Coregis also argues that St. Paul must pay its "declaratory judgment fees" for bringing this action against St. Paul. Because a trial appears to be necessary on the reasonableness of the fees spent by ASA, and because I am simply not satisfied with the briefs on the "other insurance" and "declaratory judgment fee" issues, I will deny the summary judgment motions on these points.

### III. CONCLUSION

The Blue Dane plaintiffs brought an advertising claim, and St. Paul had a duty to defend ASA under Montana law because an ordinary reading of the claim matches a straightforward study of the policy words relating to "advertising injury." Therefore, summary judgment will be entered for ASA and Coregis providing that St. Paul breached its duty to defend ASA. In addition, ASA and Coregis are entitled to indemnity from St. Paul. On the other hand, the court denies the motions for summary judgment against St. Paul on the "other insurance" and "declaratory judgement fee" questions.

IT IS ORDERED that:

1. The motions for summary judgment of ASA (filing 49) and Coregis (filing 67) against St. Paul are granted to the extent the court finds and concludes that St. Paul breached its duty to defend ASA and ASA and Coregis are entitled to indemnity from St. Paul; otherwise they are denied. The motion for summary judgment by St. Paul (filing 57) is denied in its entirety. ASA's motion for summary judgment against Coregis (filing 48) is denied.

2. Judge Piester shall set this case for trial.